---

## THE S. SHAW.*

*(District Court, E. D. Pennsylvania. January 14, 1881.)*

1. ADMIRALTY—COLLISION—ANCHORING IN MID-CHANNEL AND IN RANGE OF LIGHTS.—A bark proceeding down the Delaware river anchored at sundown in mid-channel, and in range of the government lights. A tug following her, with a schooner in tow, did not observe that she was at anchor until too late to prevent a collision by which the bark was injured. *Held,* that the act of the bark in anchoring where she did tended to produce the collision, and that she was, therefore, in fault.

2. SAME—ADMISSION OF LIABILITY—FROM WHAT CIRCUMSTANCES IMPLIED—AGREEMENT TO ARBITRATE.—The testimony left it doubtful whether the tug should have observed the bark earlier, but it appearing that the owner of the tug had offered to pay for the cost of repairs to the bark without damages for detention, which offer was refused, and had then signed an agreement to refer to arbitrators "the amount to be paid," which agreement was afterwards abandoned because he claimed the right to call witnesses as to the cause of the collision, *held,* that this amounted to an admission of some fault in the tug, and the damages should be, therefore, equally divided between the bark and the tug.

*Reported by Frank P. Pritchard, Esq., of the Philadelphia bar.

In Admiralty.

Libel by the master of the bark Ajace against the steam-tug S. Shaw for damages sustained by collision. It appeared from the evidence that the bark, on September 18, 1879, started from Philadelphia and proceeded down the Delaware river in tow of a tug. Late in the afternoon she passed the tug S. Shaw, also bound down the river, and with the schooner Annie M. Allen in tow. About sundown the tug in charge of the bark left her, and she then let go her anchor and swung round with her head to the tide, which was then ebb. The tug Shaw, coming down behind her, did not discover that she was at anchor until the vessels were in close proximity, and was then unable to prevent the schooner from colliding with and injuring the bark. At the place where the collision occurred the river was about two miles wide. The bark anchored in mid-channel, and also in range of the government lights. It appeared that, by a statute of the state of Delaware, vessels were prohibited from anchoring in range of these lights. There was conflicting testimony as to the time which elapsed between the bark coming to anchor and the collision, and as to whether the bark's anchor light was up before the collision. The theory of the libellant was that while the bark was at anchor the tug attempted to cross her bow, and the schooner was in consequence carried by the tide down upon the bark. The theory of the respondent was that while the tug was following the bark the latter, without warning, suddenly came to anchor in mid-channel, and thus caused the collision.

It appeared, also, that a day or two after the collision the owner of the tug offered to pay the captain of the bark the cost of the necessary repairs to the bark. The captain of the bark demanded $2,400, which included, besides cost of repairs, damages for detention, expenses, etc. An arbitration was then suggested, and a written agreement drawn up and signed, whereby the parties agreed "to submit the question of the amount to be paid the Italian bark Ajace, of which the undersigned, Federico Morice, is master, in consequence of the collision between said bark and the schooner Annie M.

Allen and steam-tug S. Shaw, to two arbitrators." Immediately afterwards the parties entered into a conversation, in the course of which the owner of the Shaw claimed that he had the right under the agreement to call witnesses, not only as to the amount of damages, but also as to the cause of the collision. This was denied by the captain of the Ajace, and the parties thereupon separated without attempting to carry out the agreement of arbitration. This libel was then filed.

*Henry Flanders*, for libellant.

*Henry R. Edmunds*, for respondent.

BUTLER, D. J. I find both vessels in fault. The Ajace should not have anchored where she did, — virtually in mid-channel, and within range of the government lights. The act tended directly to produce the collision which followed. It did not, however, relieve the Shaw of her duty to observe proper care and keep off if the Ajace was seen in time. Whether the latter vessel's lights were up, and whether she was, or should have been, seen in time to avoid the collision, is open to doubt, if the testimony of witnesses, bearing directly upon the question, alone, is considered. But considering also the subsequent conduct of Captain Bougher, owner of the Shaw, I am satisfied this vessel, too, was in fault. Taking the agreement to arbitrate signed by him, with his testimony, and that of Captain Guneo, respecting it, he must be regarded as admitting that his vessel was in fault. The paper, viewed alone, would justify a conclusion that he acknowledged responsibility for the entire consequences of the collision. But the testimony of Captain Guneo, as well as his own, shows that so broad an admission was not intended. At the outset he offered, unhesitatingly, to pay the cost of repairs,—covering as he supposed the entire injury sustained by the vessel—but refused to compensate for loss of time, or anything beyond such repairs. It was Captain Guneo's claim to more that led to the agreement to arbitrate. Immediately after signing the paper, the parties disagreed about its meaning. Captain Bougher, supposing himself entitled to show fault in the Ajace, offered testimony to that

point. His antagonist, denying the right to do this, objected to the offer; and in consequence of this disagreement the arbitration was abandoned. Viewed in the light of the testimony referred to, the proper interpretation of the paper is that Captain Bougher admitted liability for the loss sustained, but not the *entire* liability. This view is consistent with all he did. At the outset he asserted, on the information of his captain, that the Ajace was in fault; and he subsequently offered to prove it,—to show, as I must suppose, the *extent* of his liability. This liability depended,—the extent of it, (whether for the whole or a part only,)—on the conduct of the Ajace. No other interpretation of the paper is consistent with the conduct of Captain Bougher. If he did not intend to admit liability, he would not have agreed to confine the arbitration to the subject of damages; and if he intended to admit liability for the *entire* amount, he would not have insisted, when making the admission, that the Ajace was in fault, and immediately after, when the agreement was being carried out, have insisted on showing such fault. The only rational conclusion is that he intended to admit his own fault, and to hold the Ajace liable for hers.

A decree will accordingly be entered for the libellant for one-half the damages sustained.