## THE ANNASONA.

### THE JOHN F. LEWIS AND THE MEMNON.

(District Court, E. D. Pennsylvania. January 9, 1909.)

Nos. 8 and 9.

COLLISION (§ 61*)—TOW AND ANCHORED VESSEL—ALL VESSELS IN FAULT.

A steamship which lay at anchor in the night in the Delaware river at the Marcus Hook anchorage grounds across the Schooner Ledge Range, in violation of the rules and regulations for the port of Philadelphia and of the navigation rules, *held* in fault for a collision with a bark in tow of a tug passing up the river. The tug and bark also *held* in fault, the former, which was proceeding independently of orders from the tow, in suddenly changing her course, which would have taken her and her tow safely to the eastward of the ship and passing to the westward when so near that it was doubtful if the tow could safely follow, and the bark in failing to promptly follow the tug's change of course, due in part to the improper stationing of her lookout and in part to the inattention of the officers in charge.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 61.*]

In Admiralty. Suit and cross-libel for collision.

Howard M. Long and Theodore M. Etting, for the Annasona.
John F. Lewis and Francis C. Adler, for the John F. Lewis.
H. Alan Dawson and Charles S. Haight, for the Memnon.

HOLLAND, District Judge. A libel was filed by the Annasona against the tug John F. Lewis. The tug thereupon, in addition to its answer, filed a petition under admiralty rule 59, setting out that the steamer Memnon was to blame for the collision, and praying that the steamer should be made a party to the cause. To this petition an answer was filed by the Annasona setting out the faults of the steamer Memnon and joining in the prayer of the tug's petition. The steamer Memnon then filed a libel against the bark Annasona and the steam tug John F. Lewis, charging both vessels with having caused the collision.

A careful examination of the evidence in this case shows that on February 16, 1906, shortly after 2 o'clock a. m., a collision occurred on the Delaware river, near Marcus Hook, between the bark Annasona, whilst in tow of the tug John F. Lewis, and the steamer Memnon. At the time of the collision the Annasona was under bare poles, and the Memnon was at anchor, displaying proper riding lights. The tide was flood; the night was clear; the stars were shining, and the moon had risen. The Memnon, which was outward bound, had anchored to await flood tide; she had steam up; the pilot was on deck;

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and the men were at their stations in the engine room ready to get under way. The Memnon had swung to the flood tide, and was pointing toward Marcus Hook, heading west by north; she was 350 feet long, so that her length extended crosswise the river on the Schooner Ledge Range, and had out 45 fathoms of chain. Below the Memnon about a quarter of a mile, and eastward of her, lay the steamer Roma at anchor, and below the Roma and to the eastward of her, separated about one-quarter of a mile, was a tank steamer, the name of which is not disclosed. Both these vessels were heading in a southerly direction, their bows pointing toward the New Jersey shore, while the Memnon's bow was pointing toward the Pennsylvania shore. The bark Annasona was inward bound in tow of the tug John F. Lewis. Both the master and mate of the Lewis were first-class pilots licensed by the United States government for Delaware river and bay. The Lewis had undertaken to tow the Annasona from New York to Philadelphia, and on the arrival of the vessels at the Overfalls lightship, in compliance with the state laws, a Delaware pilot was taken on board the Annasona, who gave general directions to the bark to follow the tug and "to keep her a little on the bark's port bow." As the tug hauled around Knoll's Buoy, on the Schooner Ledge Range, a cluster of lights was made out ahead, which, upon nearer approach and within a mile, was seen to be three vessels at anchor, to wit the Memnon, the Roma, and the tank steamer, the Memnon on the ranges, and the other two vessels to the eastward of her. Otherwise the way was clear and sufficient depth of water to pass either to the eastward or westward of the Memnon, and the vessels were proceeding up the river at about eight knots an hour. The course to be steered was clearly indicated by the ranges, with which the pilots of both the bark and the tug were familiar. The Roma and tank steamer had been passed to the westward, and, if the tug had kept its course in approaching the Memnon, it, together with its tow, would have safely passed the latter to the eastward; but after passing the Roma the tug suddenly changed its course, swung off to the port and attempted to pass, with its tow, to the westward of the Memnon. The bark failed to follow immediately. The tug had passed across the bow of the Memnon and, after the officer on the latter had called to the bark to starboard the wheel, the wheelman, with the aid of the second officer, did so, but not in time to prevent a collision between the bark and the Memnon, the latter being struck on "port side just abaft the wake of the fore hatch about two or three points less than a right angle."

The evidence clearly establishes to my mind that all three of the vessels are at fault. However, the tug seems to be more at fault than that of the other two, and should bear the greatest share of the burden.

It is insisted by the officers of the Memnon that the vessel had not been anchored on the ranges, but the vessel was anchored at 8 o'clock on the evening before by an officer who then retired for the night, but it does not appear that her position was not changed by the tide; but it does, however, clearly appear from the testimony of 12 witnesses, 7 of whom are disinterested, that the Memnon was directly across

the ranges at the time of the collision at 2 a. m. on the morning of February 16th, and this was in violation of the rules and regulations for the port of Philadelphia, adopted by the board of wardens March 5, 1893, and amended February 5 and March 5, 1900, and October 5, 1903, which provides as follows:

"Anchorage.

"Vessels will be allowed to anchor in the Delaware river as follows:

"Marcus Hook Anchorage:

"Eastward of the channel marked by Schooner Ledge Range lights, opposite to and above the oil wharves at Marcus Hook"—

and also in violation of the act of March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), which provides:

"That it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft."

Other tugs, each with a tow, passed the Memnon so anchored to the westward in safety during the night, but this as was held in The Caldy, 153 Fed. 837, 83 C. C. A. 19, "is no proof that her anchorage was not in violation of the statute, or that she was not in fault for a collision with another vessel which was attempting to pass." The mere fact that the Memnon was anchored at an improper place is not sufficient to charge her with negligence, if it had in no way contributed to the accident and the fault had been clearly and solely the result of negligent and careless navigation on the part of the other vessels. Virginia Ehrman v. Curtis, 97 U. S. 309, 24 L. Ed. 890; Long Island Railroad Co. v. Killien, 67 Fed. 365, 14 C. C. A. 418. But where, as in this case, the tug and the tow were proceeding up the river at night and had passed two other vessels a short distance below the Memnon, which were anchored east of the ranges, and passed to their westward, a failure of judgment on the part of the pilot of the tug to properly locate the Memnon and sheer to the westward in time to avoid the collision could not be attributed entirely to the gross negligence of the tug and the tow. The Memnon had no right to be anchored at that point. The Milligan (D. C.) 12 Fed. 238; The Silica v. The Lord Worden (D. C.) 27 Fed. 467; The Baman (D. C.) 116 Fed. 900; The Caldy, supra.

As to the tug, the evidence shows that there was an inexperienced man at the wheel, and the officers were neglecting their duty in not being at such a position as to properly direct the movements of the tug. Those in charge of the latter were aware that the tow was following slightly to starboard for some distance before they approached the Memnon, and yet the attempt to sheer to the westward was postponed until a point had been reached where it was doubtful if the tow could have followed if it had made the attempt immediately at the time the change was determined upon by the tug. If the tug had pursued the course it was steering at the time it passed the Roma, it could evidently, with very little change of direction to starboard, have passed under the stern of the Memnon safely, and, as the tug was aware of the tow following slightly to starboard, it is most to blame

for having ignored all these facts, with which its officers were acquainted, and suddenly changed to pass to the westward of the Memnon. Conceding the tug was under the general management and control of the bark, and regarded as one vessel under steam, yet the cases cited on this point are inapplicable, where no specific orders were given to the officers of the tug who knew they were expected to proceed up the river in the usual way, following the channel, with which they were acquainted. When the tug was close enough to see clearly, the Memnon was directly on the ranges, and it became necessary to take the starboard or port side to pass. It was a situation where the tug was called upon to act, and a fault in the performance of this independent maneuver on the part of the tug, contributing to the combination of circumstances which brought about the collision, could not be shifted to the tow. As between it and the tow, the tug is responsible. The Civilta and The Restless, 103 U. S. 699, 26 L. Ed. 599; The U. S. Grant, 28 Fed. Cas. 846, 7 Ben. 195.

The Annasona was also somewhat to blame for the collision in not having the vessel properly manned, and the failure, to some extent, of the officers in charge to perform the duties required of them. Fincks was at the wheel, who was able, so far as appears, to perform that duty; Van Berg was the lookout, but had been stationed aft on the poop deck by the captain, where he was unable to see promptly what course the tug was taking; they were, to some extent, relying on the general course pursued, and assumed all was safe while they followed the ranges, without observing the required vigilance in having a lookout where he could be of most use. McDougal, the second officer of the bark, was young and inexperienced; he was in charge, and the pilot was down on the main deck nearly the entire time. This neglect on the part of the officers of the Annasona was violative of the requirements of navigation even when under tow, and there is no dc..bt but that the failure to follow promptly the tug in its change of course was due, to some extent, to the failure of its lookout and its officers to promptly discover the movements of the tug to sheer to the westward of the anchored steamer.

As in nearly all cases of collision, the witnesses called, who were in charge of one vessel or the other, failed to see or admit their own negligence, but magnified the fault of the others. The record in this case is voluminous, the evidence conflicting and difficult to reconcile, but the court has been much aided by the industry of counsel in the preparation of their briefs.

I am convinced that all are responsible for this accident, and that the tug is the most culpable, and should pay one-half of the damages resulting from the collision, and the Memnon and the Annasona each to pay one-fourth of the damages. It is so ordered.