THE GEORGIA.

THE SEACONNET.

(District Court, D. Rhode Island. October 30, 1913.)

No. 1293.

1. COLLISION (§ 82*)—MOVING AND ANCHORED VESSELS—EXCESSIVE SPEED IN FOG.

A steamer which, while proceeding up by the western passage of Narragansett Bay in the early morning in a dense fog at a speed of 6 knots or more, came into collision with an anchored vessel *held* in fault for excessive speed which was such that she could not avoid collision after sighting the anchored vessel; the place also being one where vessels were to be expected and great caution was required.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 170-174; Dec. Dig. § 82.*]

2. COLLISION (§ 80*)—MOVING AND ANCHORED VESSELS—IMPROPER ANCHORAGE.

The anchored vessel, a steam collier, which was not on any anchorage ground but in a position to embarrass all passing vessels, whether by the eastern or western channel, anchored at 4 o'clock on the previous evening owing to the fog and the facts that her compass varied and that she was light and made leeway to an unknown extent. She had left the port of Providence, however, only an hour before when the fog and all other conditions were the same and known to her master. *Held* that, while she may perhaps have been justified in anchoring where she did under the

circumstances, she was in fault for not staying in port until the weather cleared.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 152–155; Dec. Dig. § 80.*]

3. COLLISION (§ 69*)—OBSTRUCTION—VESSELS ANCHORED IN CHANNEL.

Whether a vessel is so anchored as to prevent or obstruct the passage of other vessels, in violation of Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), must be determined by looking not alone to the chart and the geography of the situation but also to the weather conditions and to the usual course of vessels using the thoroughfare.' A vessel so anchored as to leave room for the passage of vessels on either side may not be an obstruction in clear weather when an approaching vessel would have abundant time to avoid her by a change of course but may ·be an obstruction within the statute when there is a thick fog and she lies in the compass course of passing vessels.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 87–90; Dec. Dig. § 69.*]

4. COLLISION (§ 81*)—MOVING AND ANCHORED VESSELS—FOG SIGNALS BY ANCHORED VESSEL.

A vessel, anchored in a thick fog during the night, whose fog bell was rung for five seconds every second minute by the watchman by means of a cord 40 or 50 feet long, *held* not to have complied with article 15d of the Inland Rules (Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2880]), which requires the bell to be rung "rapidly for about five seconds" at intervals of not more than one minute, and to have been in fault for a collision with a moving vessel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 157–166; Dec. Dig. § 81.*]

In Admiralty. Suit for collision by Donald B. Smith, master of the steamer Seaconnet, against the steamer Georgia, the Hartford & New York Transportation Company, claimant, with cross-libel against the Seaconnet. Decree against both vessels.

Stimson, Stockton, Livermore & Palmer, of Boston, Mass., for libelant.

Haight, Sandford & Smith, of New York City, for claimant.

BROWN, District Judge. These libels grow out of a collision in Narragansett Bay on the early morning of March 15, 1913, between the Seaconnet, a steel collier, 265 feet,· 3,800 tons, trading between Norfolk, Boston, and Providence, and the Georgia, a steel single-screw steamer, 280 feet, engaged in regular service between New York and Providence with passengers and cargo, on the so-called Bay State Line.

The Seaconnet was at anchor and the collision occurred in a thick fog, about 6:10 a. m., at a point whose exact location is disputed, but somewhere in the vicinity of buoy No. 7, known as the "Middle Ground Buoy," which lies nearly south of Conimicut Point Light and about a mile away.

The Georgia was on her way to Providence through the western passage on her regular voyage from New York. She had made Warwick Light, leaving it about two lengths to port, and then steered her usual compass course from Warwick Light to the Middle Ground.

Buoy, No. 7, N. E. ¼ N., which, allowing for compass deviation, brings her to buoy No. 7, which she ordinarily passes sometimes above and sometimes below, but very near the buoy. On this morning the buoy was not observed before the collison.

It is quite clear that the Georgia had passed somewhat to the north of the buoy, and she was probably not far from her usual compass course. The wind was southerly, about 12 miles an hour, and the tide was nearly out, low water being about 6:27 a. m. As the Georgia was drawing 14 feet she could hardly have taken a course which would have brought her very much to the north of buoy No. 7. An inspection of the chart will show this.

The officers of the Georgia say that the collision followed shortly after they had passed from the shoaler water into deep water, and that they felt the ship clear herself and noticed the stopping of the vibration a moment before they sighted the Seaconnet. Capt. Flanagan of the Georgia says that he first saw her smokestack on his starboard bow about the same time that he felt the vibration stop and estimates that the Georgia was then but about two of her lengths away from the Seaconnet. She then lay across the Georgia's course, heading about N. W., nearly for Conimicut Light. The Georgia was still on her compass course and was about to haul up for Conimicut Light, but had not yet done so, when the Seaconnet was sighted.

Capt. Flanagan at once stopped the Georgia's engines and put her wheel hard astarboard. He says that when he saw the ship "she looked as though she would strike and sheer along the side"; that finding she would not clear he put her engines astern. This is criticised as tending to throw her head to starboard. Capt. Flanagan says, however, that, had he put his wheel to port, the result would have been merely to hit the Seaconnet a little further aft.

The stem of the Georgia struck the Seaconnet on her port side, about amidships, breaking some of her plates and angle bars, and twisting the stem of the Georgia.

[1] It is practically conceded for the Georgia that when the Seaconnet was sighted she was so close that it was impossible to avoid striking her.

The main fault of the Georgia was in maintaining a rate of speed which made it impossible for her to avoid the Seaconnet after sighting her, and under the conditions which existed when the Seaconnet was first sighted I am not satisfied that there was any error in Capt. Flanagan's orders or that porting his wheel would have in any degree changed the result.

The speed of the Georgia is fairly well established. She passed Warwick Light at 5:52 a. m. The engines were slowed at 6 to half speed, or 45 turns, were stopped at 6:08, and reversed at 6:09. The distance from Warwick Light is about 2¾ miles. For the Georgia it is contended that she had an average speed of 8.67 knots from Warwick to the buoy. Making all allowances for the drag of the flats over which she passed and for her slackening of speed in passing an oyster

boat, the Georgia's speed could hardly have been less than 6 knots and was probably somewhat more when she sighted the Seaconnet.

According to the testimony from the Georgia, no fog bell was heard from the Seaconnet until after she had been sighted and at a moment before the collision, although the bell at Conimicut and the whistles of other steamers were heard.

While it is true that the anchorage of the Seaconnet was unusual, yet the Georgia was in a part of the river where vessels were to be expected and where in a fog great caution was required.

I think it must be held, according to the great weight of authority, that the speed of the Georgia was excessive. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; The Martello, 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637; The Belgian King, 125 Fed. 869, 60 C. C. A. 451; The H. F. Dimock, 77 Fed. 226, 23 C. C. A 123; The Louisburg, 75 Fed. 424, 21 C. C. A. 424. See, also, cases cited in note to The Niagara, 28 C. C. A. 532; Marsden's Collisions at Sea (6th Ed.) 375 et seq.

[2] The faults charged to the Seaconnet are that she anchored in an unnecessary and improper position, in the path of traffic bound to and from Providence, and on the line of the Georgia's regular course, and remained at this anchorage from 4 o'clock in the afternoon of March 14th until the morning of March 15th, although during this period the fog had lightened enough to make it possible for her to leave this position; also that she failed to give proper notice to approaching vessels of her presence.

The Seaconnet left her dock at Providence shortly after 3 o'clock p. m., March 14th, for her voyage to Hampton Roads. The weather, Capt. Smith of the Seaconnet says, was "thick, hazy," but channel marks could be distinguished. He says that from Pomham rock to Sabins "my compass differed as near as I could judge fully three-fourths of a point." After leaving Bullock's Light, Conimicut Light could not be seen. Capt. Smith then ran by compass and by the sound of Conimicut bell. He passed Conimicut Light within 1½ lengths and could just see it. The Seaconnet was then under half speed and making probably 5 or 6 knots. After leaving Conimicut she ran on slow bell, making 3 or 4 knots. Capt. Smith says that she ran about 7 minutes, in his opinion, one-third to one-half a mile, when he anchored the ship; that he tried to get as near as he could to the center so as to give ships going by room ahead of him on the west and astern on the east; that he was then headed S. E. by S. ½ S. His ship is 265 feet long and he anchored with 40 fathoms of cable. He testifies that after leaving Conimicut bell there was nothing to run for except the spar buoy, and not knowing the error of his compass with that course, and with a S. S. W. wind of perhaps 15 to 18 miles on the starboard, and not knowing the leeway his ship would make it was almost impossible to proceed. The ship was light and drew aft 14½ to 15 feet and forward 7½ to 8 feet. He says that he had known his compass to vary from true 2½ points and perhaps more; that it had been adjusted about two months previous to the collision; and that he had noticed in

the interval between this and March 14th that after discharging the compass would be out ½ to 1½ points.

After anchoring, a little after 4 p. m., the master remained on deck until about half past 10. He saw the steamer Norfolk pass to the northeast, two lengths off, also one of the Merchants' & Miners' line. A number of mud scows passed, two to the west and one on the northeast, going down, perhaps a length off. Two steamers going down were heard. He turned in about half past 10, and at 3 o'clock looked out of the porthole to see about the weather and found conditions the same. He gave orders to the mate to say to the night watch to keep the bell ringing and call him if there was any change in the weather. The watchman was stationed on the bridge, with a line about 40 or 50 feet long from the bridge to the bell. The line was knotted to the tongue. Capt. Smith looked out again about 4 o'clock a. m., but the weather condition was the same. About 6 o'clock he heard a whistle and heard the bell of the Seaconnet ringing constantly. Somewhere about 6 o'clock he heard a whistle and started to get up, when the night watchman opened the door and said, "Captain, collision." He immediately jumped out of the office door on the port side and saw a steamer about 6 or 8 feet off, at right angles to the port side, and headed about amidships on the port side of the Seaconnet.

Capt. Smith locates the anchorage of the Seaconnet at a point about 3,000 feet below Conimicut Light and rather to the eastward of the course of a vessel rounding buoy No. 7. From the preponderance of testimony in the case, however, it appears that he anchored considerably farther to the south and substantially on the range of the Georgia's course. It would have been impossible for the Georgia, drawing 14 feet, to pass very far to the north of buoy No. 7, or over the line where the chart indicates about 11 feet, which would have been necessary in order to bring the Georgia to the place of anchorage designated by Capt. Smith.

The steamer H. C. Rowe & Co. passed the Seaconnet a few minutes before the collision. Having passed Conimicut Light she steered south, which on her compass would take her to the Middle Ground Buoy No. 7. Just before she came to the buoy she encountered a collier at anchor a trifle on her port bow. She held to the west and passed around the collier's bow, swung back to the eastward again, and as she did so made buoy No. 7. Capt. Leake of the Rowe estimates the Seaconnet's distance from the buoy at 600 feet, and he is corroborated by the pilot, who says his helm was first ported, that next the bow was swung about a point and a half to the eastward, and he then made the Middle Ground Buoy on the starboard bow. He puts the Seaconnet about two of her lengths from the buoy.

The suggestion that this might have been another vessel is without much weight. After leaving buoy No. 7 the Rowe steered S. W. ⅛ W. for Warwick Light and on this course passed the Georgia starboard to starboard, and quite near, showing that the Georgia, when perhaps a mile from the place of collision, was on substantially the regular course of vessels coming from the western passage.

The Tennessee, the companion vessel of the Georgia, running the course for the western passage on the previous evening, passed the Seaconnet, and her officers put her at that time considerably to the southward of the position claimed by the Seaconnet.

Testimony from the oyster boat C. D. Parmlee and from the steamer Lexington are to the like effect.

The testimony from the Seaconnet as to a more northerly location is corroborated by Capt. Hart of the steamer Norfolk, which also anchored somewhat further to the south.

Without attempting, however, to determine the exact location of the Seaconnet's anchorage, and giving due regard to the differences which may be expected in the testimony of well-intentioned witnesses, it must be held, I think, that the Georgia met the Seaconnet when on a course which was usual for vessels using the western passage, and that, while she may have overrun the buoy and have gone slightly more to the eastward than is usual before making her turn, it is in my opinion highly improbable that she was on a course that was substantially different from that usually followed by vessels bound to Providence from the western passage.

The brief for the Seaconnet claims that it was half tide, but this is an error, since the collision occurred about 6:10 and low water at Providence was at 6:27.

It is well established that the Seaconnet's anchorage was in a place not used for anchorage and where steam vessels are seldom, if ever, found at anchor. She was in a position where the usual courses from both the west and east passages converge, and where vessels using either passage would be likely to be embarrassed by a vessel 265 feet long swinging on a cable 240 feet long. In fact, it appears that six vessels, some using the east and some the west passage, were more or less embarrassed by her presence and were obliged to maneuver in order to avoid her. The steamer Norfolk was obliged to stop her engines and to starboard her wheel to give her clearance and was thus so thrown out of her calculations for her run to her next mark, buoy No. 5, that she was compelled to anchor and remain at anchor until the next morning. There was safe anchorage ground to the south within half or three-quarters of a mile, and it was clearly the duty of the Seaconnet to go out of the traveled way if consistent with her safety. Whether, under the conditions existing below Conimicut Light at the time of anchoring, the master was justified in then dropping his anchor, or whether in the exercise of prudent judgment he should have proceeded further, is a question of some doubt. Capt. Smith testifies that his vessel being light, and "so straight forward" would have made considerable leeway, his compass was unreliable, and that soundings at that place would have been of no avail as they were practically the same on both sides. There is also evidence that at slow speed it was difficult to run to time.

Capt. W. N. Hart of the steamer Norfolk, which also came to anchor shortly after passing the Seaconnet on the evening of March 14th, gives his opinion that under the conditions then existing the Seaconnet was justified in anchoring.

The case for the Georgia is lacking in expert opinion based upon the exact conditions which presented themselves to Capt. Smith at the time of anchoring. Whether with a ship of that type, taking Conimicut Light as his point of departure, and with a compass with an error of three-quarters of a point, which he had observed before making Conimicut Light, and with a southerly wind of about 14 miles, there would be serious danger in running in a thick fog to a point which would have brought him clearly outside the compass courses for the east and west passages is peculiarly a matter for expert opinion; and, in the absence of such testimony from the Georgia, the court should be reluctant to substitute its own judgment for that of the master of a vessel observing actual conditions, which of course can be only imperfectly reproduced upon a trial record. The judgment of the master of a vessel made in the performance of his duty is to be given weight, and especially when this judgment is approved by the master of the Norfolk, who also considered it good judgment to anchor.

But, assuming that under the conditions then existing it was necessary to anchor as she did, we must still consider whether the Seaconnet was not in fault in voluntarily exposing herself to such conditions; whether the emergency which required anchoring was not one that should have been anticipated and avoided. In leaving her dock the Seaconnet was bound to consider not only her own safety and convenience but the safety of other vessels using the route over which she was to pass.

The following are extracts from the Seaconnet's log:

2:45 P. M.  Discharged. Thick fog.
3:08 P. M.  Left dock.
4:07 P. M.  Anchored. Thick fog and rain. Wind southwest.
8:00 P. M.  Thick and rainy. Still at anchor.
12:00 P. M. Still thick. Ringing fog bell.

Saturday, March 15.

4:00 A. M.  Still thick fog.
6:06 A. M.  Steamer Georgia coming up bay hit us broadside, starting frame and plate at No. 4 hatch.

It appears that the Seaconnet, within about 23 minutes after discharging, left her dock at the Seaconnet Coal Company and within an hour from sailing was at anchor below Conimicut. There is no evidence to show any substantial change of conditions of weather in this time. If it were true that because of her liability to make leeway, and of the unreliability of her compasses, the Seaconnet was unable to run for any considerable distance without channel marks, this was as well known when she started as when she came to anchor. The master of the Seaconnet knew the location of his buoys after passing Conimicut Light; that they were not as frequent as in the upper part of the river; and if he was of the opinion that it would be unsafe for him to run without marks for a distance sufficient to have brought him to good anchorage he should not have started. The excuses which he gives for anchoring in this exposed position entirely fail to show any unexpected emergency or sudden exigency. Both the character of his

own vessel and the character of the weather conditions which she was to encounter were as obvious when she started as when she anchored, and, if under such conditions she was unable to navigate in a thick fog, this but emphasizes her negligence in starting and moving to a position where she would be compelled to remain so near the path of vessels leaving and approaching the port of Providence.

The following is an extract from the cross-examination of Capt. Smith:

C.Q. 268. And you left your dock then knowing that it was thick and might or might not clear, with a compass that you knew would change?
A. Yes, sir.
C.Q. 269. Do you consider that prudent navigation?
A. Yes, sir.
C.Q. 270. At the time you left your dock, did you take into consideration that you would have to anchor—you would not be able to navigate far away?
A. I thought if I got down north of Conimicut—
C.Q. 271. Suppose it shut down after that, what did you expect to do?
A. Get by Conimicut and anchor.
C.Q. 272. You consider, then, you were entitled to anchor anywhere below Conimicut?
A. I do; where it is not on a dug channel or on ranges.

It must be held, I think, that conditions which existed and the conduct of the Seaconnet in anchoring as she did were anticipated when she left the dock. Assuming, however, that a vessel may anchor in an unexpected fog or wherever controlling conditions overtake her, yet if she has full reason to expect such conditions, and unnecessarily goes on to meet them, they cannot then be urged as a sufficient excuse for an improper anchorage.

Not only the Seaconnet but the Norfolk, another collier, anchored in such a way as to embarrass vessels on usual compass courses, and, if colliers or other vessels were to adopt this part of the fairway for anchorage, the result would be a serious practical obstruction to the approach to the port of Providence.

While Capt. Smith says he made an attempt to place the Seaconnet between the two courses, it is evident from the chart and from the actual conduct of passing vessels that he did not avoid embarrassing vessels on either one of the compass courses. The master of the Seaconnet should have considered not only his own difficulties in a fog but also that vessels on regular compass courses would be hindered to some extent by the fog from holding to an exact course and especially in making the turn at buoy No. 7 from the western passage, would be likely to be somewhat wider off the usual range than in clear weather.

Being of the opinion that the conditions which caused the Seaconnet to anchor, if controlling conditions, of which I am in doubt, were neither unexpected nor unforeseen, I am of the opinion that the Seaconnet should not have left her dock in thick weather unless prepared to go not only beyond Conimicut Light but far enough to take her safely out of the usual course of a vessel using either passage.

She is also charged with a special fault in not shifting her anchorage in a period of clear weather during the night.

If such an opportunity presented itself, it was clearly the duty of the Seaconnet to move from her exposed position immediately on the discontinuance of the conditions which compelled her to anchor. This charge of fault is based upon evidence from witnesses who were on the tug J. S. Packard, which was towing scows to the dumping ground off Sand Point. Capt. Little of the Packard passed the steamer Norfolk at anchor and also the steamer New Orleans of the Merchants' & Miners' Line, anchored off Pappoosesquaw. He states that the weather was thick until he got down to the farmhouse on Pappoose-squaw and for an hour was clear from the farmhouse to the dump; that he was then probably three miles from the position where he passed the anchored steamer. His testimony is indefinite as to which steamer is referred to. At this point he could see the lights at Bristol over the land and on Warwick Neck. In about an hour it shut down again. In this period the New Orleans got under way and anchored again on the dump near Sand Point.

Hazard, the inspector of dumping, who was also on the Packard, testifies that the weather cleared when they were about at Ohio Ledge, and that they could see three or four miles. Neither of these witnesses was asked specifically as to the condition of the weather at the position of the anchorage of the Seaconnet and the Norfolk at the time the weather cleared in the lower part of the river.

On the other hand is the testimony of Capt. Hart of the steamer Norfolk, which anchored shortly after passing the Seaconnet, and which lay at anchor all night. Capt. Hart says that the first lift of the fog was in the neighborhood of half past 6 in the morning.

Rassmussen, who stood watch on the Seaconnet, testifies that during the night he was ringing the bell "about five seconds every second minute." He says that he received word from the captain to call him for breakfast if it did not clear up, and if it did clear up to call him right away. He went on duty about half past 5 in the evening of March 14th and stayed there until after the collision. He was on the bridge all night and rang the bell all night.

The evidence as to clearing was not specifically directed to the condition of the weather at the position of the Seaconnet, and as both the Seaconnet and the Norfolk remained at their anchorage throughout the night, and as the evidence of the watchman on the Seaconnet and of the master of the Norfolk is to the effect that at that point the fog was continuous throughout the night, I am of the opinion that the Georgia has not satisfactorily established its contention that there was negligence in not shifting the anchorage in a short period of clear weather.

[5] The Georgia charges the Seaconnet with a violation of Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), "that it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft." For the Seaconnet it is contended that, whether the place of anchorage was as she claims or as the Georgia claims, she did not in the sense of the statute obstruct or render difficult the navigation.

While there was doubtless abundant room to pass on either side of the Seaconnet, and while in clear weather only a slight change from the usual course of vessels would have been necessary to avoid her, yet the statute, as it seems to me, is not inapplicable merely for this reason, under the conditions then existing.

In a thick fog vessels must move, to use the words of counsel, "on that narrowest of all narrow channels, a compass course." A vessel anchored at or near such course in a fog may be an obstruction for the reason that, even if her presence is made known by the timely ringing of a bell, she requires special maneuvering of the moving vessel, and thus imposes a special burden upon her. If her presence be not so made known, she leaves so little opportunity to avoid her after being sighted, and requires such a sharp deviation from the compass course, that her presence would in ordinary language properly be termed an obstruction to the passage of other vessels or craft.

The evidence as to the other vessels which passed up and down the river while she was at anchor, as well as this collision, shows, I think, that she was so anchored as to obstruct the passage of vessels. What in clear weather might not be an obstruction, in a practical sense, may, in a thick fog, be considered an obstruction. An anchored vessel that can be early sighted and readily avoided by a slight change of wheel may not be an obstruction, but when she can with difficulty be sighted, and when she requires other vessels on their usual courses to stop or to maneuver sharply, she may be considered an obstruction. As a practical matter, even though a channel is of sufficient width to permit the passage of vessels on either side, so that in clear weather an approaching vessel would have abundant time to so alter her course as to easily avoid the anchored vessel, yet the coming of a thick fog introduces a new element of danger. Although the steamer must in a fog reduce her speed, which tends to give her more time for maneuvering, yet even with a reduced speed, but still with the maintenance of a reasonable headway, the moment of discovery may be so delayed as to leave but a short time for maneuvering, and the risk of collision is, of course, thus greatly increased.

Safety in a fog is not sufficiently provided for by relying solely upon the reduction of speed of the moving vessel. The statute is designed to avoid the unnecessary embarrassment of vessels on the usual courses by requiring vessels coming to anchor to have due regard for the safety of moving vessels under all conditions of weather.

While it may be reasonable to say that the statute does not absolutely prohibit anchoring in navigable channels or make it a fault to anchor where controlling conditions make it absolutely necessary, yet the question whether a vessel is anchored in such manner as to prevent or obstruct the passage of other vessels must be determined by looking not alone to the chart and to the geography of the situation but also to weather conditions and to the usual course of vessels using the thoroughfare.

I am of the opinion that the Seaconnet was so anchored as to obstruct the passage not only of the Georgia but of other vessels, and

that, as she was not forced to this anchorage by any sudden and unavoidable emergency, she was guilty of a violation of the statute.

[4] The Seaconnet is further charged with negligence in two particulars: That she had no officer on deck but only a watchman stationed on the bridge, who had been on duty continuously from 5:30 p. m. on March 14th until 6:10 on March 15th, the time of the collision, and that she adopted no proper method of warning by bell. If we take the evidence of the watchman, Rassmussen, literally, the Seaconnet was not performing her duty. The requirement of rule 12 of the Pilot Rules for Inland Waters and of Act June 7, 1897, art. 15d, is:

"A vessel when at anchor shall, at intervals of not more than one minute, ring a bell rapidly for about five seconds."

According to Rassmussen's repeated statement, he was ringing his bell about five seconds every second minute.

According to the testimony of several masters of vessels, the method of ringing the bell, by a cord 40 or 50 feet long attached to the tongue and extending to the bridge, was unusual and improper, and it was their opinion that by such a method the bell could not be rung properly. The evidence shows that the customary method of ringing the bell is by a small cord held in the hand, by which a man standing at the bell may strike the tongue quickly against the two sides of the bell alternately.

Capt. Gray of the Lexington testifies that the sound of the Seaconnet's bell was faint. Hazard, who was on the Packard, says the bell was ringing in a very dilatory way and not a quick, sharp, continuous ring.

It was doubtless the fact that the Seaconnet's bell was rung from time to time during the night, but the evidence from the Seaconnet is insufficient to show that it was rung in accordance with the rule, and the evidence from the Georgia preponderates to the contrary.

The Georgia was properly manned and her lookout was proper. She heard no bell in season to enable her to change her course to any practical extent before the collision. In fact, the bell was not heard until after the smokestack of the Seaconnet was sighted.

While it is suggested that the deposition of Rassmussen, which shows the Seaconnet to have been guilty of a violation of the rule, should not be taken literally, yet, as it is entirely in accordance with probability that Rassmussen's ringing of the bell was not in accordance with the requirement of the statute, this evidence cannot be disregarded. The occasion was one requiring special diligence, and I am of the opinion that the Seaconnet should have taken greater precautions and should have provided for a more efficient ringing of her bell.

It may be useful to include in this opinion reference to cases collected by counsel on the immediate questions at issue.

Counsel for the Georgia cite the following cases on the question of improper anchorage:

Cases prior to the statute: Ailsa v. La Bourgogne (D. C.) 76 Fed. 868, affirmed 86 Fed. 475, 30 C. C. A. 203; The Benj. A. Van Brunt, 98 Fed. 131, 38 C. C. A. 668; U. S. v. St. Louis & T. Co., 184 U. S. 247, 22 Sup. Ct. 350, 46 L. Ed. 520; The Silica (D. C.) 27 Fed. 467; The S. Shaw (D. C.) 6 Fed. 93; The Scioto, 2 Ware (Dav. 359) 360, Fed. Cas. No. 12,508; Spencer, Marine Collisions, § 99.

Cases arising under the statute: The Persian Hesperides, 181 Fed. 439, 104 C. C. A. 187; City of Birmingham, 138 Fed. 555, 71 C. C. A. 115; The Itasca (D. C.) 117 Fed. 885; The Maggie Ellen (D. C.) 115 Fed. 442; The Caldy, 153 Fed. 837, 83 C. C. A. 19; The Margaret J. Sanford (D. C.) 203 Fed. 331; The Annasona (D. C.) 166 Fed. 801.

As to precautions when at anchor: The John H. Starin, 122 Fed. 236, 58 C. C. A. 600; The Ailsa (D. C.) 76 Fed. 868; The Ogemaw (D. C.) 32 Fed. 919–925; The Frank S. Hall (D. C.) 116 Fed. 559.

Counsel for the Seaconnet cite on the question of anchorage: The Margaret J. Sanford (D. C.) 203 Fed. 331; The A. P. Skidmore—City of Lawrence, 115 Fed. 791, 53 C. C. A. 287; The Job J. Jackson—N. J. Trainer (D. C.) 144 Fed. 896; The Europe, 190 Fed. 475, 111 C. C. A. 307; The City of Dundee, 108 Fed. 679, 47 C. C. A. 581; The Northern Queen (D. C.) 117 Fed. 906.

As to the Seaconnet's lookout: The Bermuda (D. C.) 17 Fed. 397; The Altenower (C. C.) 39 Fed. 118; The Blue Jacket, 144 U. S. 371, 12 Sup. Ct. 711, 36 L. Ed. 469; The Annie Lindsley, 104 U. S. 185–191, 26 L. Ed. 716.

Upon the whole case I am of the opinion that both vessels were in fault for the collision, for the reasons above set forth.

A draft decree may be presented accordingly.