## THE BELFAST.

(District Court, D. Massachusetts. September 29, 1914.)

Nos. 713, 893.

1. NAVIGABLE WATERS ⊛≈23—"OBSTRUCTION TO NAVIGATION"—VESSEL ANCHORED IN CHANNEL.

A barge anchored at night, in a mist which obscured the hull, near the center of President Roads in Boston Harbor, and in the usual course of outgoing vessels, was an obstruction to navigation, in violation of Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (Comp. St. 1913, § 9920).

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 64; Dec. Dig. ⊛≈23.

For other definitions, see Words and Phrases, First and Second Series, Obstruction to Navigation.]

2. COLLISION ⊛≈71—MOORED AND ANCHORED VESSELS—VESSEL ANCHORED IN CHANNEL.

The steamer Belfast, leaving Boston in the night and taking the usual course through President Roads, came into collision with, and sank, the coal-laden barge Wayne, anchored near the middle of the channel. It was a very cold night, and there was a freezing mist rising from the water, which rendered the hull of the barge invisible at any distance, and, while her lights and those of other barges near by could be seen, they looked further away than they were from the Belfast, which did not reduce speed until almost upon them. *Held*, that the barge was in fault for anchoring in an improper place, and for not keeping an anchor watch, who might have sounded fog signals; that the Belfast was also in fault in not sooner reducing speed on approaching a place where it was customary for vessels to anchor.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. ⊛≈71.]

3. COLLISION ⊛≈71—NARROW CHANNELS—STARBOARD HAND RULE.

Article 25 of the Inland Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 101 [Comp. St. 1913, § 7899]), which requires steam vessels in narrow channels to keep to the starboard hand side of the fairway, is a rule of the road which defines the rights of moving vessels, and as against a vessel wrongfully lying at anchor therein a moving vessel has superior rights in any part of the channel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. ⊛≈71.]

⊛≈For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for collision by the Susquehanna Coal Company, owner of the barge Wayne, against the steamship Belfast, the Eastern Steamship Corporation, claimant, with cross-suit against the owner of the Wayne. Decree dividing damages.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.

Edward S. Dodge, of Boston, Mass., and Benjamin Thompson, of Portland, Me., for claimant.

MORTON, District Judge. The first of these cases is a libel on behalf of the barge Wayne against the steamship Belfast to recover damages for injuries sustained by the Wayne in a collision between them which ocurred about 1 o'clock a. m., on January 13, 1912, in Boston Harbor. The other case is a cross-libel on behalf of the Belfast against the owner of the Wayne to recover damages on account of injuries sustained by the Belfast in the same collision. The cases were heard together, largely on oral testimony. They are in effect one case, and the motion to consolidate may be allowed.

As to the place where the collision occurred:

The Wayne—which will be referred to as the libelant—contends that it was within the anchorage ground on the north side of President Roads, entirely outside the channel. Aside from the testimony of her captain and deckhand, her contention on this point rests chiefly on observations of her position at anchor made some time before the collision, and, for the most part, not acted upon by the witnesses who made them, on departures and courses said to have been taken by other vessels which passed near the Wayne before the collision, and on estimates of her distance from other vessels whose positions it is sought to fix. The possibilities of inaccuracy in such evidence are obvious, and are greater than usual in this case, because the weather conditions made accurate observations very difficult. The captain of the Wayne testified that when she came to anchor (about 15 hours before the collision) the tug merely cast her loose and went right along, and did not assist in getting her to a proper anchorage; that he was not familiar with Boston Harbor, and did not know where the anchorage ground was; that he was unable on account of the weather to see objects on shore distinctly; that he ran to the north as far as his way would carry him, and then anchored near some other barges; and that he did not know whether he was within the proper anchorage limits or not.

The respondent contends that the Belfast was proceeding down the channel on her customary course, which was the one usually taken by outward bound steamers of her character; that the Wayne was lying in the center of the channel on the South Boston range; and that the collision occurred there. This was substantially the testimony of the captain, both pilots, and the quartermaster of the Belfast, who impressed me as being decidedly more capable and reliable than the captain and deckhand of the Wayne. There is also evidence based on departures and courses which place the Wayne substantially where the Belfast's officers say she was.

The spot where the Wayne sank is satisfactorily established. It was correctly located by the Lighthouse Service and is given on the chart and description in evidence. Belfast's Exhibits 3 and 4. It was about 100 feet north of the South Boston range, nearly in the center of the channel through President Roads, several hundred feet south of where the Wayne contends that the collision occurred.

The Wayne, when struck, was lying to an 1,850-pound anchor and 60 fathoms of chain, in about 10 fathoms of water. She was loaded with 1,400 tons of hard coal. The shock of the collision was not severe, and was not sufficient to jerk the Wayne on her long chain and loosen her anchor. Her captain testified that the shock did not seem heavy enough for a severe collision; that it was "something like a tug or a barge swinging into us and cracking the rail." The Wayne was tailing about south; the Belfast was headed about east, and struck the Wayne on the port side near the bow, at about right angles. The photographs of the injury to the Wayne, and the oral description of it by the witnesses, leave no doubt as to the location and direction of the cut into her side. The Wayne sank about 10 minutes after the collision. During that time the Belfast's port engine was kept running slowly ahead to keep her nose in the cut and delay the sinking.

How far did this move the Wayne from the place of collision before she sank? On the clear facts, it is difficult to see how there could have been a substantial movement of the Wayne to the south. Expert evidence was offered on this point, the overwhelming weight of which is that this continued pressure of the Belfast against the Wayne's side swung the Wayne on her anchor slightly to the east, and perhaps a very little to the north, of her original position. As Capt. Wentworth points out, slow speed ahead with the port propeller on a turbine steamer having three propellers gives no such pushing power as slow speed ahead on a vessel having but a single screw. It would seem far more probable that the Wayne sank near the place of collision than that she was pushed to the south, dragging her heavy anchor and chain, several hundred feet before sinking, as the libelant contends.

This probability accords with the testimony of the Belfast's officers and is supported by other important evidence. Capt. Simms entered the harbor on the Steamship Boston a few minutes after the collision. His vessel was on her usual course, and passed north of and very close to the wreck of the Wayne, almost hitting it, while the Belfast was still turning around to go back to the city. He appears to be, and is referred to by the libelant's counsel as, a "disinterested witness." He says that after passing the wreck he had to sheer to port (to the south) to clear other barges, nearer the city than the Wayne, which were lying across his course up the channel. The Wayne had undoubtedly been the most southerly of the group of barges anchored around there. If so, and if Capt. Simms is, as I believe, testifying with substantial correctness, the Wayne had been lying nearly in the center of the channel through President Roads, slightly to the north of the South Boston range, was struck by the Belfast while

in that position, and was pushed a short distance easterly, almost parallel with the range, before sinking. I think that that is what occurred; and I accordingly find that the Wayne, when struck, was lying at anchor nearly in the center of the channel, in the commonly used part thereof, a short distance westerly, in a line about parallel with the South Boston range from where she sank. She was swinging almost squarely across the channel, and, in connection with other barges anchored near her, but farther north, so obstructed the northerly half of the channel as to make navigation through it impracticable.

[1] As to the conduct of the Wayne:

The determination of the place where the collision occurred disposes of the Wayne's contention that she was free from fault. She had taken no adequate care as to her place of anchorage. She lay a considerable distance outside the prescribed anchorage ground, nearly in the center of a channel which has been held by this court to be a narrow one (see The Schooner Baxter, The Vera, and The Melrose, 226 Fed. 369), where she had no right to be. She had been seasonably notified by the harbor master that she was outside the proper limits for anchored vessels, and she made no efforts to change her position. It is not pretended that she was forced by accident or stress of weather to anchor where she did; there was neither necessity nor excuse for her doing so. I do not think that what passed between the harbor master and Capt. Carlsen, as to which I accept the harbor master's version of it, amounted to permission for the Wayne to stay where she was. Capt. Hird's offer to send her own tug, if he could find it, did not relieve the Wayne from making all reasonable efforts herself to shift her dangerous position. For at least five hours before the collision there was nothing in the state of the weather to prevent the Wayne from being moved; but her captain made no effort to send again for the Tacony, or to get other assistance.

The law applicable to the foregoing situation has been so fully covered in other cases that extended discussion of it here is unnecessary. See The Vera and The Melrose, 226 Fed. 369, Dodge, J., Sept. 14, 1912; The Georgia (D. C.) 208 Fed. 635, 644; The City of Birmingham, 138 Fed. 555, 71 C. C. A. 115; The Strathleven, 213 Fed. 975, 130 C. C. A. 381; The Hilton (D. C.) 213 Fed. 997. The Wayne was "obstructing" the passage of vessels in the channel, as that word is defined in The City of Birmingham, supra.

"An anchored vessel, that can be clearly sighted and readily avoided by a slight change of wheel, may not be an obstruction, but when she can with difficulty be sighted, and when she requires other vessels on their usual courses to stop or to maneuver sharply, she may be considered an obstruction." Brown, J., The Georgia, supra.

I find and rule that the Wayne was violating both Act Cong. of March 3, 1899, § 15 (30 Stat. 1152), and the rules and regulations of the harbor master of the port of Boston (regulation 8), which have the force of law. While she was not directly on the South Boston range, she was so near it as to interfere with and imperil vessels following that course in the ordinary way. The steamship City of Boston, coming in that night on the South Boston range, barely missed striking the wreck. I find and rule that the Wayne was violating

Act Cong. May 14, 1908, c. 168, § 6, 35 Stat. 162 (Comp. St. 1913, § 8442).

I also find and rule that the Wayne was violating the general rules of prudent seamanship in anchoring and remaining at anchor, under the circumstances here shown, in a position so perilous to herself and to other vessels, without maintaining an anchor watch, or adopting any unusual precautions for her or their safety, and that these faults are among the contributing causes of the collision. The John H. Starin, 122 Fed. 236, 238, 58 C. C. A. 600 (C. C. A. 2d Circuit). The Wayne was lying directly in the path of vessels entering and leaving the port of Boston, outside the proper and usual location of anchored vessels, in a vapor which was heavy enough to obscure her hull and which made it difficult for vessels using the channel to see her. She was called upon to be unusually vigilant, and she did not even maintain an anchor watch. If she had sounded fog signals, the Belfast would have been apprised of the existence of an obscuring vapor farther down the harbor, which had escaped her attention; and if at the time of the collision the Wayne's anchor chain had been released, the force of the collision might have been sensibly diminished. The whole conduct of the Wayne shows an almost complete disregard for her own safety and that of other vessels. Considering the large number of vessels carrying passengers and freight which pass through this narrow channel, and whose safety was needlessly imperiled by the Wayne, I am compelled to hold her to have been seriously at fault.

[2, 3] As to the conduct of the Belfast:

It is charged that she was at fault for not keeping to the right of the center line of the channel. The exact location of that line is not easy to determine; but the Belfast seems to have been slightly to the left of it when the collision occurred. She is not on that account alone to be held at fault. Outward bound vessels frequently took substantially the same course as the Belfast on the night in question, and after the accident usually passed north of the wreck. Article 25 of the Inland Navigation Rules is a rule of the road and defines the respective rights of moving vessels in narrow channels. As against a vessel entering through this channel, the Belfast was bound to keep her starboard side of it. Her rights on the other side of the channel were inferior to those of the entering vessel. But as against a vessel not proceeding, but wrongfully lying at anchor there, the Belfast's right as a traveling vessel was superior in any part of the channel. The John H. Starin, 122 Fed. 236, 239, 58 C. C. A. 600.

It is also charged that the Belfast was proceeding at excessive speed and was not keeping a proper lookout. The night was starlight and apparently clear. Leaving her wharf shortly after midnight, which was several hours later than her stated time of departure, the Belfast proceeded down the harbor on her usual course. Her officers were experienced and competent men, who had been constantly running in and out of the port of Boston for years. They were thoroughly familiar with the harbor and the course which they were running on the night in question. The captain, two pilots, and a quartermaster

were in the pilot house, and a lookout on the forward deck. All were alert and attending to their duty. Above Buoy 9 the steamer was slowed to pass a drill boat; thereafter she was put at full speed, about 14 miles per hour. As she approached Buoy 6, wisps of vapor were noticed by the bow watch. They were light and scattered; and he paid no attention to them and did not report them. Owing to the excessive cold, the thermometer being slightly below zero, a vapor was rising from the sea and was being frozen as it rose. It formed patches of low-lying mist, which were larger and denser down the harbor than up near the city. This is established by the testimony, not only of the Belfast's officers, but of the keeper on duty at Deer Island Light; of Anderson, one of the Wayne's crew, who says that at midnight he could see only from her house to amidships; of Capt. Simms and Capt. Wentworth, who came in from sea that night, and say in effect that the vapor was heavier down the harbor and thinned as they approached the city; and of other witnesses. There were two or three other barges anchored near the Wayne. The vapor was sufficiently thick and high to obscure their hulls and to resemble fog. It differed from fog, in that it did not extend more than six or eight feet above the surface of the sea, and, as above stated, was patchy in character. This frozen vapor is an unusual, but not an unknown, phenomenon, which, during extremely cold weather, occasionally occurs.

To the men above it, in the Belfast's pilot house and on her bridge, the top of this layer of vapor, owing to a mirage effect, looked like the top of the water, and was by them mistaken for the surface of the sea. The lights of the Wayne and of other barges at anchor near her, projecting above the vapor, were clearly visible, and appeared as if they were close to the water; they were judged by the Belfast's officers to be a long way off. It was, however, realized by the Belfast's officers that these lights were scattered pretty much across her course, and that caution would be required in maneuvering through them when they were reached. While the Belfast was, as her officers supposed, still distant from the lights, her speed was slowed and the searchlight turned on, pointed ahead; the chief pilot remarking, just before this was done, that he guessed they could find a way through the anchored vessels. If these vessels had been as far away as they were judged to be, the handling of the Belfast was careful and proper, and she was slowed in good season.

As soon, however, as the searchlight was turned on, it disclosed near at hand, not the hull of the barge Cassie (which was obscured by the vapor), but her masts projecting above the mist. The Belfast's helm was thereupon put to port, the purpose being to go astern of the Cassie. The searchlight was swung to the right more rapidly than the Belfast swung in that direction, and disclosed the masts of the Wayne, also lying with her hull obscured in the vapor. It was realized that the Belfast might not go clear of the stern of the Wayne. The engines of the Belfast were at once put full speed astern, and the helm of the Belfast was thrown hard astarboard.

This movement of the helm is charged as a fault. It was ordered by Captain Brown because, as he testified, he doubted whether the

Belfast would clear the Wayne completely if the helm was kept hard aport; if she did not clear the Wayne, and struck her near the stern, the collision would be likely to kill some of the Wayne's crew; in the emergency he thought it better to change the helm and try to go ahead of the Wayne, between her and the Cassie. He considered that he had as good a chance of clearing the Wayne entirely in this way; and if the collision did occur, he was giving the crew of the Wayne a much better chance to get away. I am unable to say that these views were wrong, or that after the emergency had arisen the Belfast was not properly handled. Nor do I think that the Belfast's lookout was at fault for not reporting the unconnected wisps of vapor which he noticed on the way down the harbor. Nobody on board the Belfast became aware of any obscuring vapor until just about the time when the searchlight was turned on and the Cassie was discovered. There seems to have been a patch of this curious vapor, in President Roads and the channel through it, which concealed the hulls and lower parts of barges anchored there. The vapor froze on the hulls, giving them a gray color, and making them very difficult to see.

The Belfast's fault in respect to speed was certainly not great. She was barely moving when she came into contact with the Wayne. The collision was in fact almost averted. The depth of the cut on the deck of the Wayne was due to the very sharp bow of the Belfast and her great weight, and to the inertia of the loaded and anchored Wayne. The cut did not penetrate the lowest side planks on the Wayne; it was deep higher up, because of the overhang of the Belfast's bow.

The Belfast was a high-powered and fast vessel, sluggish in maneuvering, and slower in losing headway under reversed engines than a vessel equipped with reciprocating engines. She was running, not on a right of way, like a railroad train, but through a public harbor. Her officers knew her limitations, and knew that they were approaching a group of anchored vessels, through which they would have to pick their way. It devolved upon them to get their vessel under control in ample time. They intended to do so, and, on account of a curious condition of the weather, misjudged the distance, and the location with respect to the channel, not of a single vessel, but of the whole group. They knew where the anchorage ground was, that it would be usual for anchored vessels to be lying thereabouts, and less usual for a group of them to be lying close to or outside of Deer Island. These facts ought to have put them on their guard, and to have caused them to distrust their judgment of the distance, to the extent, at least, of having their vessel under control as she passed through the anchorage ground channel. Men in charge of powerful machines are customarily held to a very high degree of skill in the exercise of their judgment. Considering all the facts, I think that the Belfast was at fault in not sooner reducing her speed, and that her fault is sufficiently clear, so that she must stand her share of the loss.

Decree that each vessel was at fault and for divided damages.