---

## THE CALDY.

## THE NEW ORLEANS.

### (District Court, D. Maryland. June 22, 1903.)

1. COLLISION—STEAMER AND ANCHORED VESSEL—OBSTRUCTING CHANNEL.
   A steamship 314 feet long, which was anchored in the center of the Brewerton Channel of the Patapsco river, where it was 600 feet wide, and left there through the night, during which she swung around nearly at right angles to the channel, and was struck by a steamer attempting to pass under her stern, *held* in fault for unnecessarily obstructing the channel, there being safe anchorage grounds within a few miles, for keeping a negligent and insufficient anchor watch, and for failing to move up and change her position when she swung across the channel. The passing steamer also *held* in fault for going at too high speed, and without sufficient care in navigation, in view of the manifest danger in passing, and the known tendency to sheer when going close to the side of the channel, which in fact caused, or contributed to, the collision.

In Admiralty. Cross-libels for collision.

Daniel H. Hayne, for the New Orleans.
Blakistone & Blakistone, for the Caldy.

MORRIS, District Judge. On December 30, 1902, the British steamship Caldy, 3,042 gross tons, length 314 feet, beam 40 feet 6 inches, drawing 21 feet aft, loaded with iron ore from Benizaf, arrived between 4 and 5 o'clock in the afternoon at a point in the Brewerton

Channel of the Patapsco river, about opposite to the narrow channel leading from the Brewerton Channel to Sparrows Point. The destination of her cargo was Sparrows Point. After dark, about 8 o'clock that evening, the steamship New Orleans, 1,017 net tons, drawing 17 feet 6 inches aft and 14 feet 6 inches forward, having left the port of Baltimore for Savannah, was proceeding down the Brewerton Channel, and in attempting to pass on the southern side of the channel and under the stern of the Caldy the port bow of the New Orleans struck the overhang of the Caldy's stern opposite her rudder post on the port quarter about six feet from the stern, and both vessels were very considerably damaged. A Chesapeake Bay pilot had brought the Caldy in from sea, and had expected to bring her to Baltimore, but the quarantine officer met the steamer near the Sparrows Point Channel, and informed her master that the ship was to go into Sparrows Point, and that a tug would come out in a few minutes to assist her in, and so the pilot had her drop her anchor about the center of the channel, which is there 600 feet wide. In a little while the tug came out from the Streelton Works at Sparrows Point, and her master reported that there had been delay in getting a ship out, and there would be no berth there for the Caldy until the morning, when the tug would come and take the Caldy in to her pier. The pilot then told the master of the Caldy that the ship was anchored in a safe and proper place, and, if it breezed up, to give her more chain, but not enough to let her ground, and the pilot then got aboard the tug, and came to Baltimore.

The pilot testifies that when he left the steamship at about quarter past 5 she was swinging with her head pointing east by north, which would be only about three points off from the direction of the channel; but it seems quite certain that by 8 o'clock the wind had veered more to the northward, and that she was lying more directly across the channel. The testimony of at least half a dozen competent and disinterested witnesses from other steamers, whose duty it was to observe the Caldy carefully in shaping their course to go by her, is that she was between 7 and 8 o'clock lying nearly directly across the channel. There was no tide or current to affect her, and her heading was determined solely by the wind. The pilot testified that he dropped the anchor just about on the center line of the channel, and the contention on behalf of the Caldy is that as she lay at 8 o'clock there was a space of 100 feet clear between her stern and the southern edge of the channel, and 300 feet between her anchor and the northern edge. It is earnestly contended on behalf of the Caldy that the New Orleans should have passed the Caldy on the northern side of the channel, and should not have attempted to pass on the southern side.

What the master of the New Orleans did is to be judged by what he was able to make out in the nighttime with regard to the position of the Caldy by a careful observation of her lights. The master of the New Orleans testifies that he was proceeding down in mid-channel as indicated by the range lights, which would fix his position accurately, and that to all appearance, if he had continued that course, he would have struck the Caldy a little forward of her beam; that when four or five ships' lengths off, and when the Caldy's forward light was a

little on the port side of the stem of the New Orleans, and her stern light a fraction of a point on his starboard bow, he ordered the quartermaster to port, and when he had the Caldy's stern light half a point on his port bow, having changed the course three-fourths of a point, he gave the order to steady; that then, after going about two ships' lengths, and in order to give the Caldy all the room he could, he again ordered the wheel to port. He then noticed that his ship was not answering her helm, but was swinging to port towards the Caldy, and, when one ship's length off, he ordered the wheel hard-a-port, but it did not break the sheer, and then he ordered the engines first to slow and then to stop; that he did not reverse, because, having a left-handed propeller, reversing would have thrown his bow still more to port. He testifies that he never thought of passing the Caldy to the northward, because, not knowing how her anchor chain lay or what sort of a vessel she was, and how long a jib boom she might have, it did not appear to him safe to pass to the northward, and it appeared to him that there was more room to the southward under her stern.

As to the conclusions of the master of the New Orleans, from what he could make out with regard to the position of the Caldy, that it was best to go astern of her, his judgment is confirmed by the action of the masters of three steamers which went down the channel just ahead of him, and who all chose the same course, and passed under the Caldy's stern. The steamer Atlanta, the steamer Georgia, the steamship Howard, steamers similar to the New Orleans in size and speed, all passed the Caldy to the southward, and at their full channel speed; but all felt the effect of the bank of the channel by a perceptible tendency of the ships to sheer. This unanimity of very experienced mariners may be said to be conclusive that the judgment of the master of the New Orleans as to the proper side on which to pass the Caldy, judging by her lights, was a sound conclusion. The watchman on the Caldy also testifies that all the steamers which passed before the collision passed under her stern, and none across her bow. The navigators of these steamers testify that the Caldy, when they passed her, was heading north-northeast, and tailing nearly at right angles with the channel.

The faults alleged against the Caldy are: (1) Negligence in unlawfully anchoring in the Brewerton Channel at night in such manner as to obstruct the passage of other vessels; (2) that she had a negligent and insufficient anchor watch; (3) that she failed to adopt reasonable precautions required by her exposed position. I think the preponderance of proof shows that the Caldy was in fault in all of these particulars. It is urged against the Caldy that she was violating the act of Congress of March 3, 1899 (2 Supp. Rev. St. p. 997, 30 Stat. 1152, c. 425 [U. S. Comp. St. 1901, p. 3543]), which enacts "that it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such manner as to prevent or obstruct the passage of other vessels or craft"; and the act imposes a penalty on the person who places the obstruction. In reply it is urged on behalf of the Caldy that the channel is 600 feet wide, and that there was room for the Caldy to anchor without obstructing the passage of other vessels; that there was no other anchorage for a ship drawing 21 feet

except at a distance of five or six miles; and that it is quite customary for vessels bound to Sparrows Point to anchor in the Brewerton Channel near the entrance of the narrow Sparrows Point Channel. Unquestionably, the act of Congress being in aid of commerce and navigation should receive a sensible construction to further that end, and, as suggested in Hughes on Admiralty (page 264), possibly the true meaning is to forbid completely obstructing a channel, or obstructing it so as to render navigation difficult. So far as concerns the liability in case of collision, the statute probably only emphasizes the previously existing maritime law. It has always been held a fault to so anchor a vessel as to unnecessarily and negligently obstruct a navigable channel. Spencer on Collisions, § 152. That the Caldy, as she lay at 8 o'clock, did render the navigation of the channel difficult, is shown by the fact that the three steamers ahead of the New Orleans, which passed her on the side which seemed to them safest, all felt the tendency to sheer from the proximity of the southern bank of the channel. While it is true that ships do frequently anchor in the channel awaiting opportunity to go into Sparrows Point, they seldom remain there at anchor at night, and, if they do, they are bound to exercise the greatest precaution because of the great danger to passing ships. When the pilot left the Caldy at quarter past 5 o'clock, according to his testimony she was lying nearly parallel with the course of the channel; but when she swung with the wind she must have been nearly across it. The channel is 600 feet wide, and the Caldy is 314 feet long. Her anchor was about mid-channel, and she must have obstructed nearly half the width. This was undeniably a dangerous obstruction.

I think it also appears that the anchor watch was inattentive to the orders which had been given him. The first officer testified that he instructed the watchman to call him if the ship swung, and he testifies that the Caldy was heading east by north half north when at 6 o'clock he went below, leaving the watchman in charge of the deck. The watchman testifies most positively that he saw the Steelton lights off her starboard side, pretty well abeam, at least five or six points off the starboard bow. If the ship had continued heading east by north half north, the Steelton lights, which are exceedingly bright electric lights, would have been on his port side. The watchman further testified that he did not see the New Orleans until after the collision, because he was on the Caldy's starboard side, and the engine room skylight was between him and the New Orleans. This would not have been so likely to have happened if the Caldy had been then pointing east by north and the New Orleans coming down astern of her. The fact was that the whole crew were tired out with a very hard voyage, and at 6 o'clock all went below, except the watchman, and he failed to call any one on deck when the ship swung across the channel.

It would seem, considering the extremely dangerous position in which the steamer was when she swung across the channel, that she should have been moved, and her anchor cast near the northern edge of the channel. She was not anchored at the first in a safe anchorage, and it does not seem to me that the pilot should have gone away

and left her.  The officers of the ship knew nothing about the channel, nor the depth of the water, and the pilot was the only one competent to meet any emergency which required the ship to be moved.  There was no absolute necessity in the first place to leave the ship anchored there for the night.  It was simply a convenience.  There is safe anchorage for vessels drawing 21 feet well out of the channel opposite the old quarantine ground, about six miles nearer to Baltimore.

The remaining question is whether the New Orleans was also in fault.  She would have passed in safety but for the sheer she took. That sheer was largely due, I think, to her speed, and to some unskillfulness in her navigation.  All the steamers which immediately preceded her passed the Caldy without collision, although with some difficulty.  The New Orleans maintained her full channel speed, which is only less than her full speed because she does not, in river waters, carry as full a head of steam.  The danger of sheering away from the shoal bottom outside the dredged channel is a most common difficulty in navigating these channels.  It is one that all vessels must be on guard against, as it constantly happens that, in order to pass vessels, they must approach the shoal water.  The danger can be guarded against by lessened speed and careful navigation.  The master of the New Orleans, from the lights of the Caldy, judged her to be lying across the channel, with the center line of the channel at about her midships.  He knew that he would be obliged to navigate the New Orleans very carefully and prudently to pass a vessel at night so lying. There was risk of collision apparent, and the necessity of going close to the southern edge of the channel, with the risk of sheering.  This, it seems to me, called upon the master of the New Orleans to slacken speed, and have his ship more perfectly under control.  The New Orleans having a left-handed propeller made it dangerous for her to reverse, and there was, therefore, additional need of timely precaution. Her sea going speed is 11 knots.  Her engines were at full speed when approaching the Caldy, but, as she was not carrying a full head of steam in the river, she was probably not making over eight knots, although this is left somewhat uncertain.  I think the proper precaution for safe navigation in this channel, obstructed as it was by a steamer lying across it, required that the New Orleans, when she found how narrow was the space, should have slowed in order to lessen the risk of a sheer.  A great many of the collisions in these channels have resulted from the steamer approaching the bank taking a sheer.  It is a danger well known to those who navigate them, and it is well known that it must be guarded against.  It is a risk increased by the speed with which the steamer approaches the shoal water at the edge of the channel.

I therefore hold that the New Orleans was also in fault, and the damages will be divided.

The damages at the wharf at Steelton were not the direct result of the collision, and are not recoverable in this suit.