THE CALDY.

THE NEW ORLEANS.

(Circuit Court of Appeals, Fourth Circuit. May 7, 1907.)

No. 677.

1. COLLISION—VESSEL ANCHORING IN CHANNEL—OBSTRUCTING PASSAGE OF OTHER VESSELS,

While Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543], providing that it shall not be lawful to tie up or anchor vessels or other craft in navigable channels "in such manner as to prevent or obstruct the passage of other vessels or craft," was not intended to absolutely prohibit the anchoring in navigable channels, it makes it unlawful whenever the result is to obstruct other vessels in passing to such extent as to make such passing a dangerous maneuver; and the fact that other vessels have succeeded in passing one so anchored in safety is not proof that her anchorage was not in violation of the statute, or that she, was not in fault for a collision with another vessel which was attempting to pass.

2. SAME—STEAMER AND VESSEL ANCHORED IN CHANNEL.

A steamship 314 feet long, which was anchored through the night in the Brewerton channel of the Patapsco river, where it was 600 feet wide, and which was allowed to swing around so as to lie nearly across the channel, so that her stern was only about 100 feet from one side, while her anchor chain extended toward the other, held in fault for unnecessarily obstructing the channel and liable for a collision with another vessel, which was attempting to pass under her stern. The passing vessel also held in fault for not navigating with proper care and at slower speed in

passing, in view of the well-known tendency of vessels to sheer when near the edge of the channel.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 102.]

Brawley, District Judge, dissenting.

Cross-Appeals from the District Court of the United States for the District of Maryland.

For opinion below, see 123 Fed. 802.

T. Wallis Blakistone and J. Parker Kirlin, for appellant.

Daniel H. Hayne, for appellee.

Before GOFF, Circuit Judge, and BRAWLEY and McDOWELL, District Judges.

GOFF, Circuit Judge. These cross-appeals are from a decree of the District Court for the District of Maryland, rendered on the 7th of April, 1906, in the consolidated cases of the Merchants' & Miners' Transportation Company, claimant of the steamship New Orleans, against Samuel Symonds, master and claimant of the steamship Caldy, and Samuel Symonds, master of the steamship Caldy, against the steamship New Orleans. The decree found both vessels at fault for a collision that occurred while the Caldy was at anchor in the Brewerton channel, off Sparrows Point, near Baltimore, about 8:30 p. m., on December 30, 1902.

The libel in the former case was filed January 3, 1903, in which the Caldy is charged with fault in these particulars: That she negligently and unlawfully located herself at anchorage, that she had a negligent and insufficient anchor watch, and that she failed to exercise a reasonable precaution in putting out stern anchors that she might lay up and down the channel. The answer of the Caldy denied the allegations of the libel, and averred that when she arrived off the mouth of Sparrows Point channel, near where the collision occurred, all the berths at said point were occupied; that the channel leading into Sparrows Point from the Brewerton channel was too narrow for the purpose of an anchorage, and that, there being no other anchorage ground in that vicinity, she anchored in the Brewerton channel, about opposite the mouth of the Sparrows Point channel, in such position that she was not an obstruction; that she complied with all legal requirements regarding her anchor lights and an anchor watch—and charged that the collision was caused by the fault of the New Orleans. The master of the Caldy on January 13, 1903, filed his libel against the New Orleans, in which the allegations as made in his answer to the libel of the New Orleans are in substance set forth; and to this libel the claimant of the New Orleans, in making answer, substantially repeated the allegations contained in its libel. A large number of witnesses were examined in behalf of each steamship, and a number of interesting and important questions are raised by the voluminous record presented for our consideration. The opinion of the court below is found in 123 Fed. 802, to which reference is made for a more particular description of the circumstances relating to said collision.

We fully agree with the court below in finding that the Caldy was in fault in anchoring as she did in the Brewerton channel. We are

of opinion that her anchor was considerably northward of the middle of the channel, and that, whatever her position may have been when her pilot left her, at the time of the collision she had shifted with the wind, until she was lying nearly across the channel, her stern not quite 100 feet from the southern bank thereof, heading but little cast of north; the wind direction being from that quarter. Her pilot was mistaken when he located the Caldy's anchor south of mid-channel, else how could she, with at least 90 feet of anchor chain, herself 314 feet long, swing with the wind across the channel, which was 600 feet wide, and still leave her stern about 100 feet from the southern bank, as the evidence shows it was at the time of the collision. If the anchor was at the place the pilot of the Caldy thinks it was, then when the wind changed, and the vessel, shifting with it, swung southward with stem to north, where would her stern have been? The court below found—the conclusion was irresistible—that at the time of the collision the Caldy was lying nearly directly across the channel, and it is evident that her distance from the southern bank was not far from 100 feet; hence it follows that her stem must have been about 114 feet northward of mid-channel. It was a physical impossibility for the Caldy, at the time she cast her anchor, to have occupied the position relative to the middle of the channel that her crew testified she did.

Being in the position we find from the evidence she occupied, it follows that the Caldy did obstruct the passage of other vessels; for as she was anchored some distance north of mid-channel, the wind from the north holding her across the channel, she naturally caused other vessels entitled to the southern side to fear to attempt to pass to the north because of the unknown length of her anchor chain, and she rendered the southern side at least hazardous, as was demonstrated by the three vessels that did succeed with difficulty in passing, and by the one that made the effort and failed. The fact that other vessels had frequently anchored in the Brewerton channel, near where the Caldy had cast her anchor, and that no damage resulted therefrom, does not prove that the Caldy was not in fault, but tends to show that such other vessels were navigated with the prudence and judgment that unfortunately we are unable to find in the seamanship of the Caldy. It is likely true that the Caldy at the time she anchored was headed west by north, and that before her pilot left her she swung with the tide and wind, with her 15 fathoms of chain, until her heading was east by north; but still we are forced by the overwhelming weight of the evidence to the conclusion that at the time of the collision she had been carried by the wind, the tide not interfering, until she was heading but little, if any, east of north. This would place her almost directly across the channel, and allowing say 100 feet for the passageway south of her—the approximate distance given by those who passed her— would place her considerably north of mid-channel, with her anchor chain extending still farther to the northward.

Counsel for the Caldy insist that because other vessels, both before and after the collision, succeeded in passing her safely, it follows she was properly anchored, and that she did not obstruct navigation. We do not agree to this, for it does not follow that vessels of different size, some requiring more speed than others, some less or more depth

of water, moving with varying winds and tides, some being navigated with more skill than others, could all successfully, or with the same degree of risk, pass her as she was then anchored. Even in this particular instance, some of those passing, as a matter of precaution, went out of the channel in doing so, their draft permitting, and the others were materially interfered with by the sheer caused by their necessary proximity to the southern bank of the channel. This argument may show that the position of the Caldy did not prevent the passage of other vessels; but it does not show that it did not "obstruct the passage of vessels and craft."

The Caldy did not exercise proper care in anchoring, for she obstructed the channel to a far greater extent than the necessities of the situation required, than the statute permitted, than ordinary caution should have suggested. When she concluded to make her temporary anchorage answer for the night, she might have held her place by dropping her stern anchors, with which she was supplied, or she might have arranged for moving her anchor if the change of the wind and the consequent swinging of the vessel rendered it expedient for her to do so. No such precautions were taken, the risks of the night were either not appreciated or recklessly assumed, and with an indifference which it is desirable may never be duplicated, a careless watch was left on deck, all others going below. The pilot had left them. The crew were strangers to the locality, absolutely ignorant concerning the channel, without even a chart to guide them. They knew of their danger, for the pilot had admonished them, and the first officer was to have been called if the vessel swung; but he was not.

We do not think the Congress intended by Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543], to absolutely forbid anchoring in navigable waters, except only at such places as the location of the vessel would necessarily prevent the passage of other vessels, or obstruct them in passing to such an extent as to make the effort to do so a dangerous maneuver. If a vessel anchors at a point in a channel where, notwithstanding such anchorage, other vessels, navigated with the care the situation requires, can safely pass, then she has neither violated the statute, nor rendered herself liable under the general rules applicable to navigation, even though to a certain extent she has obstructed the channel.

The navigator of the New Orleans, coming down the middle of the channel, observed the Caldy when a mile distant and saw that she was at anchor, located as he thought across the channel, one-half her length on each side. He had therefore—provided his location of the steamer was correct—the distance of 143 feet on the northern side, from which the anchor chain was to be deducted, in which he could pass, and 143 feet for the same purpose between her stern and the southern bank. He was entitled to the southern side—to pass to the starboard—and, besides, as he was unaware of the length of the Caldy's anchor chain, which he thought was well across the channel, he concluded, as did the other steamers passing the Caldy that evening, that it would be safer to pass under her stern on the southern side. With this conclusion under then existing conditions we find no fault. But we think that the evidence conclusively shows he was mistaken when he located

the Caldy where he did, for at that time her stern was considerably nearer the southern edge of the channel than he had calculated it to be, as we have found from the testimony and as became apparent to him when his vessel sheered and refused to respond to his port wheel.

The master of the New Orleans did not give the order to port as soon as he should have done, nor did he seem fully to appreciate the danger he was incurring in his movement to pass the Caldy. The Atlanta ported when one-half mile from the vessel at anchor, the Georgia and the Howard in time to counteract, before they reached the Caldy, the sheer with which they both contended. The Georgia moved closer to the southern bank, and the Howard left the channel. The New Orleans was within 1,300 feet of the Caldy when she first ported. She then, having steadied her helm, proceeded with the Caldy's stern light half a point on her port bow, until she was about 500 feet distant, when she again ported; but her master, seeing that his vessel was swinging to port and not answering her helm, gave the order to hard aport, hoping thereby to overcome the sheer. But he failed so to do, and the orders to "slow down" and "to stop," which followed, did not prevent the collision. Her speed increased the danger from the sheer, which was well known to her master, who, familiar, as he was, with that channel, and of the tendency of vessels to sheer when near its banks, should have guarded against it by slowing down and approaching more cautiously, thereby retaining better control of his own vessel. The other passing vessels evidently went by under greater speed than was prudent, taking the risk and fortunately escaping accident.

The fact that the New Orleans has also been found in fault does not, under the circumstances disclosed by this record, palliate the offense of the Caldy; but it does provide for her a companion in misfortune and liability. The Caldy, having violated the provisions of the statute applicable to her anchorage, was required, in order to excuse her for that fault, to show, not only that her fault did not contribute to the disaster following, but also that it could not have done so. This she has signally failed to do. The decree appealed from is without error.

Affirmed.

BRAWLEY, District Judge, dissents.