## THE SARATOGA.

## THE TAUNTON.

(District Court, E. D. Pennsylvania. May 6, 1910.)

### Nos. 38, 47.

1. COLLISION (§ 123*)—SUIT FOR DAMAGES—CONTRIBUTORY FAULT.
   The fault of one vessel being plain and sufficient to have brought about a collision, fault in the other must be clearly proved before she can be required to contribute to the damages.
   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 259–261; Dec. Dig. § 123.*]

2. COLLISION (§ 91*)—STEAM VESSELS MEETING—NEGLIGENT NAVIGATION.
   A collision occurred in the Delaware river at Horseshoe Bend, below Philadelphia, between the steamship Saratoga going down light and the Taunton, an English vessel, coming up from the sea. It was daylight. The vessels saw each other when two miles apart, and exchanged passing signals when a mile apart, and were on courses involving no danger of collision until the Saratoga ran against a mud bank on the side of the channel which was well known, and gave her a sheer that she could not overcome until she struck the Taunton. The Saratoga was going at a speed not less than eight knots an hour. Held, on the evidence, that the Taunton was on the proper side of the channel, and not in fault, but

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that the fault was solely that of the Saratoga in striking the bank, and in going at too high speed.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. § 91.*]

In Admiralty. Suit by the owners of the steamship Saratoga against the steamship Taunton, and cross-libel against the Saratoga. Decree against the Saratoga alone.

H. Alan Dawson, and J. Rodman Paul (Biddle, Paul, Miller & Jayne, of counsel), for the Saratoga.

J. Parker Kirlin, Henry R. Edmunds, and Charles R. Hickox, for the Taunton.

J. B. McPHERSON, District Judge. These cross-libels seek to determine the liability for a collision that occurred on the Delaware river shortly before 8 o'clock in the morning of June 17, 1907, between the steamships Taunton and Saratoga. There is little dispute about the facts, save in one or two particulars.

The Taunton is a British vessel, single screw, of 2,461 registered tons, 350 feet long, and 47 feet beam. She was carrying a full cargo from Calcutta to New York by the way of Philadelphia, and drew 22 feet 6 inches of water. The Saratoga is an American vessel, twin screw, 430 feet long, 50 feet beam, and (being in ballast) drew only about 18 feet forward and aft. She was upon her trial trip, having just been finished, and was proceeding down the river in charge of a licensed pilot. The Taunton was also in charge of a licensed pilot, but was coming up the river from the capes on her road to Philadelphia. It was broad daylight in clear weather, and there was no obstruction to the vision of those upon either ship. The tide was about two-thirds ebb—say, a foot above mean low water—and was running from 2 to 2½ knots an hour. There were no other vessels in the neighborhood that interfered in any respect with navigation. At first the speed of the Taunton was about 6 knots, while the Saratoga was steaming at a faster rate—not less than 12 knots—as she approached the black buoy hereafter referred to. The vessels caught sight of each other at least two miles away, thus having ample space and opportunity for the proper passing maneuvers. At this time the Taunton had passed the town of Red Bank on the New Jersey shore, and was following a course that lay a little south of the Lower Horseshoe range. She was also south of League Island, and was proceeding eastwardly along the curve of the river known as the Horseshoe Bend. This bend begins not far above a black can buoy, C 37, as will appear by reference to the official chart. Coming down from Philadelphia, the direction and course of the river and the navigable channel are nearly north and south until the neighborhood of this buoy is reached. Below it the direction and course are nearly east and west, until League Island is passed; so that in going down the river below the buoy the Pennsylvania shore is on the north or starboard side, while the New Jersey shore lies on the port or south side. In other words, the buoy marks the turn where both the river and (especially) the channel bend abruptly about 45 degrees to the westward,

and its position is close to the northern or Pennsylvania side of the deep water channel. An extensive and dangerous shoal lies between the buoy and the visible shore. A red spar buoy, S 46, lies five-eighths of a mile further west, and marks the southern or New Jersey side of the deep channel. The shoal is a large mud bank, which makes out for about a half mile from the Pennsylvania shore. Its outline along the channel is irregular, projecting at one point especially, which is referred to in the testimony as the "seventeen-foot lump," and falling off there abruptly almost at the channel's edge. As the shoal is always covered with water, the surface of the river from shore to shore is wide, although the navigable deep water channel is much narrower. At or near the black buoy 24 feet of water can only be found for about 700 feet, while 20 feet can be found for about 150 feet more to the north. Below, the red buoy the width is greater—about 900 feet for a draft of 24 feet, and about 1,300 feet for a draft of 20 feet. The channel course in this east and west reach beginning not far below the turn at the black buoy and extending to a point about two miles below League Island is west by north in going down, and east by south in coming up, the river. It is customary for vessels coming up the river through this reach and rounding the Horseshoe, especially when they are stemming an ebb tide, to keep upon the southern side of the channel, so as to make a gradual turn around the bend, and to lessen the set of the tide against their bows.

The Saratoga was well above the black buoy and was on the Taunton's port bow when the vessels became aware of each other's presence. As they approached, but while they were still a mile or more apart, the Taunton was slowed to half speed. Then, or not long afterwards, she blew one blast on her whistle, which the Saratoga promptly accepted and answered. The Taunton ported slightly at this time, although the maneuver was unnecessary, as both vessels were apparently on courses that would certainly carry them clear. The Saratoga did not slacken speed until she was nearly abreast of the black buoy, when she gave the signal to slow the engines, and some reduction in speed was thereupon made; but at no time before the collision was she moving more slowly than eight knots. She rounded the buoy closely, and straightened out on a westerly course to pass south of the Horseshoe shoal. The two steamships were then proceeding in opposite directions on nearly parallel courses, and would have easily cleared each other, port to port, if each had continued as she was heading. Unfortunately the Saratoga, as she was straightening out, got too far to the northern edge of the channel, struck and slipped off the 17-foot lump, suddenly sheered in a marked degree, changed her course decidedly—about four points—and stood across the channel towards the Taunton, the two vessels being then about a quarter of a mile apart. Immediate efforts were made by both vessels to prevent the threatened collision. The Taunton ported again, and promptly stopped her headway by going full speed astern, and the Saratoga made an unsuccessful attempt to break the sheer by the vigorous use of her port helm, then by backing her starboard engine, and afterwards by going ahead on her port engine. In spite of these efforts, however, the disaster could not be averted. The sheer

persisted, and the Saratoga struck the Taunton nearly amidship at an angle of about 45°, and injured her so badly that it was necessary to beach her at once. Neither vessel sounded any signal after the first exchange until shortly before the collision, when a danger signal was blown by the Taunton; but no signals after the first were imperatively called for by the situation, and the collision was in no respect due to their absence. The Saratoga was also injured, although not so severely, and, after continuing down the river for a short distance, returned to the shipyard. The Taunton was beached by her own engines on the south or New Jersey side of the river, just inshore of the red buoy, and remained there making temporary repairs until the following day, when she was pulled off and towed to Philadelphia. As already stated, the sheer of the Saratoga was caused by touching, or "smelling," the shelving side of the Horeshoe shoal (almost certainly at the 17-foot lump), just after rounding the black buoy while her speed was still too great for safety in a situation that called for cautious movement.

These facts are either conceded or clearly proved, and I think it must be agreed that not much remains to be decided. There can be no doubt that the sudden sheer of the Saratoga was the primary cause of the disaster, and that the sheer was the direct result of her contact at too high a speed with the steeply shelving bank of the shoal. It follows inevitably that she was at fault for being there at all, and, in any event, for the speed at which she approached. No adequate or satisfactory explanation is offered on her behalf—except that the Taunton "crowded" her, and this will be considered in a moment—and the inference must therefore be drawn that she had carelessly got out of the channel, perhaps in reliance on the fact that she was light, and was drawing several feet less than if she had been loaded. Really, as it seems to me, the only question that admits of controversy is the position of the Taunton when she was struck. If she was out of her proper course, if she was too far to the Pennsylvania side of the channel, so that it might fairly be inferred that she had been crowding the Saratoga, or had been taking an unnecessary risk by seeking to pass too closely, she may also be at fault, and may be obliged to share the damages. There is much testimony upon this point, conflicting, as may readily be assumed, and I see no good reason for discussing its rather voluminous details. The questions are all of fact, and in my opinion the fundamental dispute should be decided in favor of the Taunton. I believe, and so find, that she was on the proper side of the channel, namely, toward her starboard, or the New Jersey shore of the river, when she observed the other steamship, and that she maintained this relative position throughout. She proceeded at all times south of the Lower Horseshoe range, and ported twice in order to get farther to starboard and afford the Saratoga more room. I am satisfied that she was not to the north of the range at any time, and did not crowd the Saratoga in the least. The collision took place (as I think) where the weight of the testimony decidedly tends to place it, namely, a little west of the red buoy, and close to the spot where the Taunton was immediately afterward beached. The fault of the Saratoga being plain, it is well settled that fault in the Taunton must

be clearly proved before she can be called upon to contribute to the cost of the injury. The Caldy (D. C.) 123 Fed. 802; Id., 153 Fed. 837, 83 C. C. A. 19; The Australia, 120 Fed. 220, 56 C. C. A. 568; The Fontana, 119 Fed. 853, 56 C. C. A. 365; The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053.

A decree may be entered adjudging the Saratoga to be solely at fault, and appointing a commissioner to ascertain the damages.