### THE BAKER BROS.

(Circuit Court of Appeals, Second Circuit. June 10, 1919.)

No. 184.

1. COLLISION ⚓70, 71(2)—STATE STATUTE AS TO VESSEL LYING AT END OF PIER NOT BINDING ON COURTS OF ADMIRALTY.

While Greater New York Charter, § 879, making it unlawful for a vessel to lie at the end of a pier, except at her own risk of injury from vessels entering or leaving adjacent slips, is not binding on federal courts of admiralty, it affords ground for imputing fault to a vessel violating it, but does not prevent her recovery for a collision caused by the failure of a vessel entering or leaving an adjacent slip to exercise reasonable care.

2. COLLISION ⚓71(2)—TUG LIABLE FOR COLLISION WITH VESSEL AT END OF PIER.

A tug backing from a slip in East River in daytime, with a strong ebb tide, held in fault and liable in half damages for collision with another tug, lying with others at the end of the pier below, against which she was swung by the tide, where she knew the risk, but made no effort to have the other vessels moved.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by the Southern Transportation Company against the steam tug Baker Bros.; the Baker Towing Company, claimant. Decree for respondent, and libelant appeals. Reversed.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and George W. P. Whip, both of New York City, of counsel), for appellant.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for claimant.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. The libelant appeals from a decree dismissing the libel. The cause of action arose out of a collision, on September 29, 1916, between the tug Augustine, owned by the libelant, and the steam tug Baker Bros. At the time of the collision the tug Augustine was lying moored outside of one or two other boats at the end of Pier 5, East River, Manhattan, city of New York. Outside the Augustine was the tug John Hughes. In the slip between Pier 5 and Pier 6 a number of canal boats were lying moored. About 2:15 p.

⚓For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

m., and when the tide was strong ebb and the weather clear, the tug Baker Bros., which was lying in the slip between Piers 5 and 6, backed out, and in passing the end of Pier 5 collided with the stern of the Augustine, whereby the latter tug is alleged to have been damaged in the sum of $1,000.

The Baker Towing Company, owners of the tug Baker Bros., filed an answer, in which they prayed that the libel be dismissed. Among the reasons assigned for asking that the libel be dismissed, it was stated that in lying moored at the end of Pier 5 the Augustine violated the statutes of the state of New York. The case was heard in open court, and after testimony had been taken the court below dismissed the libel on that ground, and held that vessels so moored do so at their own risk, and without claim for damages caused by vessels entering or leaving an adjacent pier. The court concluded that the Augustine was at least a contributing, if not the sole, cause of the damage, and declared that the only question in the case is whether the Baker is liable for any part of the damage caused by the collision.

In reaching the conclusion that the Augustine was alone liable, the court relied on The Saratoga (D. C.) 180 Fed. 620, and The Stadacona, 242 Fed. 624, 155 C. C. A. 314. In the latter case the principle was applied that, where danger has been created by the fault of one vessel, the other will not also be condemned, unless her fault appears clearly and satisfactorily. Had the Augustine not been a stationary vessel, and the Baker not been subject to the rule that it is the duty of a moving vessel not to injure one which is stationary in a crowded slip, there would have been no difficulty in the case. But the court did not think that the contributing fault of the Baker was sufficiently established by the evidence to overcome the principle that in such cases the contributing fault must be shown clearly.

[1] The charter of the city of New York (Laws 1901, c. 466) in section 879 declares that—

"It shall not be lawful for any vessel * * * or tug to obstruct the waters of the harbor by lying at the exterior end of wharves in the waters of the North or East River, except at their own risk of injury from vessels entering or leaving any adjacent dock or pier."

The section goes on to declare that a vessel, boat, or tug violating the provision shall not be entitled to claim damages for any injury caused by any vessel entering or leaving an adjacent pier; and while this statute is not binding upon the federal courts sitting in admiralty, this court has held that it affords grounds for imputing fault to a vessel violating it. The Allemania, 231 Fed. 942, 146 C. C. A. 138; The Chauncey M. Depew, 139 Fed. 236, 71 C. C. A. 362. But this court in an admiralty case does not enforce the provision that a vessel or tug lying at the end of wharves shall not be entitled to demand damages for any injury caused by any vessel entering or leaving any adjacent pier. Fred E. Jones v. Steam Tug Amanda Moore, 257 Fed. 405, —— C. C. A. ——, decided February 14, 1919.

[2] The fact that the Augustine was moored at an improper place, and was consequently primarily at fault, did not release the tug Baker

Bros. from the obligation to exercise reasonable care in leaving the adjacent slip. The Augustine was at rest, in full view, in clear weather, and in broad daylight. The tug Baker Bros., being in the slip between Piers 5 and 6, which it had entered that day, backed out of the slip at full speed; the slip being so filled with canal boats that the tug could not turn around. The tide at the time was ebb and strong. The following excerpt from the testimony of the master of Baker Bros. sheds light on the situation:

"Q. How is the strength of the tide at this particular place? A. It is very strong; the tide comes in, flood tide, from the bay; the ebb tide as it comes in sets from the Brooklyn shore over towards the New York piers.

"Q. That would have a tendency of swinging you down towards Pier 5? A. Yes; because, on account of Governor's Island, the tide runs strong between Governor's Island and the New York shore. * * *

"Q. In that position, just tell us what happened. A. Why, as I backed out, I didn't have room enough to work up the river; always I back out full speed, and as soon as the ebb tide got my stern it started setting me down the river, and of course, before I could clear the Augustine's bow about 30 feet from our stern, our guard fetched up against his stern iron, the guard on the port side.

"Q. * * * I mean, under what bells do you move? A. We have to come out full speed, because, if not, coming out slowly, the tide would set us down against anything on the end or against the corner of the pier. * * *

"Q. And you back out faster? A. Yes, sir.

"Q. And the tide pulled you down against the Augustine? A. Yes, sir.

"Q. Before backing out, you did not request any one to move those boats? A. No, sir.

"Q. And you backed down—you knew that strong tide was there? A. Yes, sir.

"Q. And you knew that the tendency of the tide was to set you down toward Pier 5? A. Yes, sir. * * *

"Q. Is it the custom in the slip there to have boats which are placed that way removed, or do you just take a chance in getting up? A. As a rule, it is a good deal of taking a chance, because there are so many boats at a time like that, and you ask them to move, and they say, 'The captain's in the street,' or 'The engineer isn't here,' or 'You can get out without moving.' * * *

"Q. You were in a tight place, and knew it? A. Yes, sir.

"Q. You knew you had a close shave to get out, didn't you? A. Yes, sir; but it is customary that you work around those piers in very close quarters."

The testimony shows that the master of the Baker Bros. knew in beginning his maneuver that he had only a chance of success; that he took that chance and failed. He knew the strength of the tide and the position of the Augustine, which projected 15 or 18 feet beyond the pier, and that the tide would pull him towards the Augustine with great force. If he knew that he had only a chance, and it was necessary that he should go out, it was not prudent for him to attempt to go out without making an effort to get the Augustine moved. The fact that he had never succeeded in having a boat shifted when he had requested it did not in law excuse him from making the attempt in this case. In Jones v. Amanda Moore, supra, we held that the tug No. 18 was at fault for close shaving, and not attempting to get the Amanda Moore to remove herself and scow from their position at the end of the pier. We think that case is decisive of this.

In The Clarita and The Clara, 23 Wall. 1, 14 (23 L. Ed. 146), the court said:

"Undoubtedly, if a vessel anchors in an improper place, she must take the consequences of her own improper act; but whether she be in a proper place or not, and whether properly or improperly anchored, the other vessel must avoid her, if it be reasonably practicable and consistent with her own safety."

In the instant case it was the duty of the Baker Bros. to avoid the Augustine, if it was "reasonably practicable and consistent with her own safety." This duty, under all the circumstances, she did not perform.

The decree is reversed, and the cause remanded, with directions to divide the damages and the costs below equally between the Augustine and the Baker Bros. Costs in this court are awarded to the appellant.