## THE LEHIGH.

## THE BALLENAS.

## IRA S. BUSHEY & SONS, Inc., v. THE LEHIGH.

## GRASSELLI CHEMICAL CO., Inc., v. THE LEHIGH.

### Nos. 1913, 1914.

District Court, W. D. New York.

Aug. 15, 1935.

Macklin, Brown, Lenahan & Speer and Richard F. Lenahan, all of New York City, for libelants.

Foley & Martin and Christopher Heckman, all of New York City, for steam tug Ballenas.

Duncan, Leckie, McCreary, Schlitz & Hinslea and Thomas H. Garry and Lee C. Hinslea, all of Cleveland, Ohio, for the Lehigh.

RIPPEY, District Judge.

This action arises out of a collision between the steamer Lehigh and the barge Loretta in the vicinity of the entrance to Detroit river at about 12:30 on the morning of September 27, 1933. The Loretta was sunk and was a total loss, and her car-

go was a partial loss. Libels were filed against the Lehigh by Ira S. Bushey & Sons, Inc., a New York state corporation, owner of the Loretta, to recover damages for her loss, and by the Grasselli Chemical Company, Inc., a Delaware corporation, owner of the cargo, for damages for its loss. The steam tug Ballenas, owned by Steam Tug Ballenas, Inc., and her operators, the W. E. Hedger Transportation Corporation, New York state corporations, were impleaded in each of the actions under petitions by the owners of the Lehigh, under Admiralty Rule 56 (28 USCA following section 723). The Lehigh was owned and operated by the Bethlehem Transportation Corporation, incorporated under the laws of the state of Delaware.

The Detroit River Light is located at the juncture of two prepared channels leading from Lake Erie to the main channel of the Detroit river. The east channel, about 400 feet wide, is used exclusively for upbound heavily loaded boats, and extends southeasterly from the Detroit River Light at an angle of about 12° a distance of 2 1/16 miles. At the southerly entrance to this channel is located a flashing red gas buoy. All upbound vessels from points on Lake Erie converge at the entrance to this channel and thence pass northerly to the Detroit River Light and thence up the Detroit river into Lake St. Clair. All heavily loaded upbound boats must use this prepared channel, while vessels running light may use the shallower water of the lake to the east or west. The west channel is used exclusively for heavily loaded downbound boats which must use it to keep from grounding in the shallow water at its sides. It extends southwesterly from the Detroit River Light at an angle of approximately 12° a distance of some 3 3/4 miles. At the southerly exit are located buoys, from which vessels diverge on courses leading to Lake Erie ports. The distance from a point on a line due south of the gas buoy at the entrance to the upbound channel at right angles due west to the exit of the downbound channel is about 1 1/2 miles, while the distance between the entrance to the upbound channel and the exit of the downbound channel is approximately 2 1/3 miles.

At midnight, September 23, 1933, at Buffalo, N. Y., the steam tug Ballenas took four barges in tow in tandem formation bound for the Grasselli Chemical plant on the Detroit river. They were ordinary wooden canal barges and had been brought from New York City loaded with sulphur via the Barge Canal. After a continuous voyage without previous anchorage or change of order or of arrangement or equipment of the tow, she arrived at the vicinity of the entrance to the upbound channel leading to the Detroit river about 8 p. m. on the night of September 26th. The night was dark, it was raining, there was a strong wind from the southwest and heavy seas were running. To take the barges up the channel, it was necessary to haul in the hawsers and bring the barges close together. Attempting this maneuver, the captain was able to shorten the hawser between the tug and the first barge, but found the conditions of weather and sea made it unsafe to proceed further, and decided to anchor temporarily, until the wind and sea subsided. Each barge had an anchor, but it was not used. Only the tug's anchor was out. As anchored, the vessels were arranged in the following order: (1) the tug Ballenas, 155 feet in length; (2) 75 feet astern of the tug, the barge American Transport; (3) 700 feet further astern, the barge Loretta; (4) 700 feet further astern, the barge David Foster; and (5) 700 feet further astern, the barge American Scout. Each barge was from 110 to 120 feet in length, and the entire length of the tow from the tug to the stern of the last barge was approximately 2,770 feet.

As thus anchored, the tug was located at a point about 4,000 feet southwesterly of the red gas buoy at the channel entrance, and the tail end of the tow about 2,000 feet to the northeast of the buoy. The string of vessels headed southwesterly and tailed northeasterly.

All witnesses (except the mate on the tug) agree, and I find that the tug and tow lay at anchor across the entrance to the river channel about half a mile out in the lake and directly across the course regularly followed by upbound vessels navigating between Lake Erie ports and Detroit. They do not agree as to the location of the Loretta relative to the gas buoy at the time she was struck by the Lehigh. Lighthouse Bulletin No. 31, published by the United States Department of Commerce Lighthouse Service under date of September 29, 1933, describes the wreck of the Loretta as lying in 26 feet of water 13,600 feet 159 1/2° from the Detroit River Light. This would indicate that the wreck was located about

2,600 feet from the gas buoy. The captain of the tug located her before the collision at about 1,200 feet to the eastward of that spot, while the officers of the Pegassus place her at about the same distance, nearer the flash-light. The captain of the tug testified that after the Loretta was struck, the tug and remaining barges were out of line some 1,200 feet. The evidence is clear that the Lehigh was moving very slowly at the time of the collision, and continued to move very slowly forward until the Loretta sank a minute or a minute and a half afterward, and the Loretta could not have been pushed far northerly from her anchorage until she went down. From all the evidence, I find that the Loretta lay at anchor before the collision almost directly in front of the entrance to the river channel and approximately 2,600 feet southeasterly of the gas buoy at its entrance.

The master of the Ballenas knew the tug and tow were lying across the entrance to the channel and across the course of upbound boats. He expected to remain at anchorage temporarily only, until the wind and sea subsided. Conditions became no better, however, and he remained there all night. Had he anticipated that weather and sea would continue bad he would have anchored at the lee of Middle Sister Island, some twelve miles to the east, or would have anchored to the south of the entrance, out of the course of both upbound and downbound vessels, where there was plenty of room. He made no change in his lights. At no time did he display anchor lights either on the tug or barges. During the four hours preceding the collision and while at anchor, the Ballenas displayed two white headlights on the forward mast six feet or more apart vertically, indicating she had a tow; a range light on the after spar and two regular colored running lights, red on her port side and green on her starboard side, while each of the barges displayed colored running lights, red on the port side and green on the starboard. The two stern barges displayed a white light hung on a spar aft above the cabin about 20 feet above the deck. The lights on the tug were all electric; those on the barges were oil lamps or lanterns, and similar to those carried on barges in the New York State Barge Canal. The white lights on the barges were not, however, of sufficient intensity and brightness to be seen by a person of ordinary vision, without the aid of marine glasses, over half a mile. Their dullness is probably accounted for by the fact that they were ordinary lanterns without an inside globe or chimney set over the light to protect it from the wind and to prevent smoking, as is ordinarily used on barges on the Great Lakes. There was some rain and mist, and just before the collision, while visibility was bad, lights of suitable kind and in proper condition could be seen long distances, the Detroit River Light being visible for at least 7 miles, the lights on the Ballenas being visible for more than 3 miles, and the buoy lights marking the channel being visible for about 5 miles. The colored lights were of the type of regulation colored light available in ship supply stores. The lights on the tug indicated that she was not anchored but, rather, under way. The lights on the barges likewise indicated they were under way.

The captain, mate, and engineer on the tug and the men on the barges testified that the lights were clear and bright. The testimony of the mate was contradictory on some points, contrary to the testimony of a number of witnesses on other points and palpably contrary to the facts in these and other respects. These facts, together with his appearance and conduct on the stand, compel me to reject his testimony as worthless for any purpose. The testimony of the captain at the trial was different than before the inspectors in important particulars. Neither their testimony nor that of other witnesses from tug and barges can be accepted on disputed points, where testimony of disinterested witnesses was given to the contrary, or where the weight of the evidence and the probabilities indicate the contrary. The weight of the evidence indicates that the men were overworked and fatigued and inattentive to details of happenings before and at the time of the collision. The captain of the tug was off watch and in his cabin, and the engineer was below preceding and at the time of the collision. The mate was stationed in the pilot house, and the windows of the pilot house were open. Each barge had one man on board. The man on the American Transport was in his cabin but came on deck when he felt a jerk on the tow line due to the collision; the man on the Loretta was in bed in his cabin and was awakened and came on deck at the time of the collision; the man on the David Foster was on deck at the time of the collision; the man on the American Scout was in bed and asleep and knew nothing of the collision until two hours later. Although the Ballenas had a full complement of officers

and crew aboard as prescribed by her certificate of inspection, the barges were without lookouts, from and after the time the tug anchored, required under the special conditions then obtaining. The man on the David Foster testified that he had a large flash-light, about 18 or 20 inches long, with five cells in it, and that, as the Lehigh approached, he went out to the bow of his boat and was waving the flash-light up and down, showing it across the bow of his boat and back onto the hatches and stern of the Loretta. There is no corroboration of this testimony. That he so acted is quite improbable, in view of the conduct of the rest of the men on the barges. But even if true, the signals came too late to be of use as a warning to the Lehigh of the position of the Loretta so as to enable her to avoid the collision.

The Lehigh, a steel ship, 550 feet in length over all, of 55-foot beam, and with a draft of 18' 6" forward and 18' 10½" aft, and fully loaded with coal, left Sandusky, Ohio, at 6 p. m., September 26, 1933, with a full complement of competent officers and crew, and bound for Milwaukee. The captain was in charge until she reached South East Shole, some 36½ miles east of the red gas buoy. He then turned over the navigation of the vessel to the second mate, leaving word to be called at the gas buoy entrance to the river channel, and went to his cabin on the forecastle deck on the starboard side of the ship. At 12:15 a. m., the first mate went on watch, and the vessel was then about three miles from the red flashing gas buoy at the entrance to the river channel. Each officer, while on watch, was stationed in the upper pilot house at the front window, which was open. Up to the time of the collision, the wheelsman was in the lower pilot house with the windows closed, and a lookout was stationed on the forecastle deck in the eyes of the ship. Rain was falling, the night was dark, and the ship was headed with the wind slightly over her port side. It was the kind of a night that required a competent and attentive lookout.

On the stretch from Colchester Light to the Detroit river channel entrance, some 13 miles, the Lehigh was first on a course, by the ship's compass, of west by north ⅝ north, 287° magnetic. After picking up the red gas buoy about midnight, the pilot of the Lehigh ported half a point, making the new course northwest by west, ⅞ west, 293°, which course was maintained until

the time of the collision. On such course, the Lehigh would pass to the southeastward of the red gas buoy approximately half a mile, and then make a turn to the northward of about 60°. The course of the Lehigh was that regularly followed by upbound boats approaching the river entrance. She was followed by the Lynch, which was maintaining the same course. She was moving full speed ahead at the rate of about 11 miles per hour, or about 968 feet per minute. The lookout changed at 12:15 a. m. Ten minutes later, the lookout stepped back from the bow of the ship about 30 feet to the captain's cabin and called him, as instructed, as the vessel was approaching the entrance to the channel, and immediately stepped back to his post. He was not gone from his post over half a minute. The vessel must then have been nearly one mile from the Loretta. About three minutes later (or about 12:28 a. m.), the captain entered the pilot house, found that the engines had been stopped, observed the Loretta, ordered the engines put in full speed reverse, which was done about two boat lengths (1,100 feet) from the barge, and a minute and a half later the Lehigh struck the barge a light blow at an angle of 45°. He thereupon ordered the engines slow ahead to enable his ship to keep in touch with the barge so that any one on the barge might be rescued. The man was taken off the barge, she slid off the starboard side of the Lehigh and sank.

The question of whether the Lehigh was at fault as causing or contributing to the collision must depend on whether the mate and the lookout saw or ought to have seen the Loretta at a sufficient distance to enable her, in the exercise of reasonable care, to avoid the collision. This involves, of course, the question of whether she had a competent and attentive lookout on duty.

All of the men on the Lehigh who were in a position to see testified in substance that there was no indication of the presence of the Loretta until the Lehigh had reached a point some 1,500 feet away. This was undoubtedly too late to avoid the collision. The lookout had previously returned to his post after his call to the captain. The mate, looking through his marine glasses, picked up a little red light dead ahead, the port running light, very dim, and he ordered the engines stopped. This order was promptly obeyed. Immediately afterward, the captain appeared in the pilot house and at once saw the lights on the

two stern barges and the red light ahead, and ordered the engines in reverse. The captain did his full duty promptly and efficiently as soon as he took charge. The Lehigh does not rely on the testimony of the mate and the lookout exclusively to show that it was impossible to learn of the position of the Loretta earlier than he did. The testimony of disinterested witnesses from other vessels in the vicinity is important and decisive not only on that point but on the question of the faults of the Ballenas and Loretta.

The navigating officers and the lookout on the Lehigh saw the gas buoy light and the white lights on what turned out to be the tug before 12:15 a. m. Just what the tug lights meant was not clear. They were to port and south of the course of the vessel. As the Lehigh approached the river channel, the distance between the tug lights and the buoy light was widening, the tug lights were getting further away from her bow, the bearing was increasing, and the indication was that the Lehigh was passing a vessel at a safe distance, not running into one. No fault can be charged against the Lehigh because of any action she took or omitted to take in connection with the observation her officers and lookout made, or omitted, with reference to those lights at any time. Even if those lights indicated they were on a vessel with a tow, in the absence of any evidence of a tow or of a part thereof dead ahead, and under the facts and circumstances disclosed by the evidence, she could not have been expected either to change her course, slow her engines, stop, or reverse. No uncertainties entered into or affected the navigation of the Lehigh because of the lights on the tug. The Lynch, without cargo, was following the Lehigh about a half mile back. Her officers corroborated the officers of the Lehigh both as to character, number, location, and time of discovery of the lights on the Ballenas. They did not see the lights on the barges until 12:25 a. m., when they were about three-quarters of a mile away. Being without cargo, they passed around the tug and into the channel. They say the lights were dim and could not be seen with the naked eye. The Lynch had to make a "U" maneuver, out of her course, to get around the tug.

Captain Larson, of the Pegassus, and a disinterested witness, gave testimony that left no doubt that the Ballenas and tow were lying in such a place as to interfere with and impede navigation, that her lights were dull, that little or no attention was being given by her officers and crew to that fact or to the fact that they owed at least the duty of ordinary care to warn vessels of their position. The Pegassus, bound for Buffalo, at about 10:30 p. m., passed out of the downbound channel, making the turn at Buoy B Gas 7 known as the old turning point and located about a mile and a half northerly of the present southerly exit of the channel. Normally, as the captain passed out of the channel he would have to change his course to port approximately 90° to straighten up on the Colchester course, and would pass at least one mile south of the point where the Ballenas was anchored. As he started to turn, he saw two headlights "which showed there was some kind of a tow under way and he seemed to be headed toward Toledo," and the lights were to the south of the gas buoy. He steadied on about 102°, which was the true course for Colchester. When he got to a point within three-quarters of a mile or so of the Ballenas, he blew two whistles to indicate he would pass under her stern, received no answer, blew two more blasts, but still received no answer. He started to starboard at the second two-blast signal, and as he was swinging he discovered four dim green lights about one-quarter mile away, and took out his glasses and was then able to discover the outlines of the barges. He continued to swing to port six or seven points, passed between the red gas buoy and the barges, and swung around the stern of the last barge and straightened up on the Colchester course. This maneuver carried him over a course shaped like the letter "S." The only white light he saw on the barges was a dim white light on the last barge. He was asked to describe all the lights he saw on the tug and tow, and said: "I saw two headlights on what I afterwards found to be the tug; two headlights which indicated she had a tow, and I am almost positive she had a range light on her after spar, and as I approached within—or just before I blowed the first signal, I will say within three-quarters of a mile, I saw the green light of the tug, which would indicate she would be under way. There was nothing to indicate she was at anchor or anything." After he had cleared the tug and was on the swing, he said, "I saw a dim light, at first, and as I was swinging I made it out to be a green light, which I took to be the tow, and shortly after I could see the outline of a barge."

"As I was moving along and swinging at the same time I picked up another dim light, which I took to be the second barge, and so on until I passed the fourth and last barge." He said he saw five green lights, altogether, and one white light on the stern barge. Had he kept on his course after he straightened up after leaving the channel, he would have passed under the bow of the tug, but as he believed the tug was headed toward Toledo, he felt it would be best and safest to pass under her stern. The mate of the Pegassus corroborated the captain in all substantial particulars. When the first two-blast signal was given, he said, in spite of the fact that he was using his glasses he could not distinguish the barges and did not thereafter distinguish the barges until he had swung to port and was about three boat lengths away from them, and the lights were dim; "they looked to be little oil lanterns; they were green lights." "We saw a dim white light on the stern barge; that is the only white light we saw."

The captain of the Joseph Wood, a freighter running light, drawing 9 feet forward and 16 feet aft, and up the lake over the Colchester course, did not discover the Ballenas and her tow until she was so near that, in spite of the fact that she shut down her engines and swung 40 to 50°, she was able to go around the stern of the tow and to miss a collision by only 75 or 100 feet. She did not see the "white light dangling on a pole, or something" on the stern barge, until she was on the swing. The maneuver to enable her to clear the tug and tow carried her so far north that she was required to pass north of the red gas buoy instead of to the south as usual, and to enter the channel, out of the usual course, between Red R. N. 4 and R. Gas & Bill 2. She passed the red gas buoy at 11:22 p. m.

From the foregoing it must be found from the overwhelming weight of the credible evidence that the only lights on the Loretta preceding and at the time of the collision were the red and green running lights on her bow, dim and located low and near the water; that the two rear barges each had similar running lights similarly located and also a dim white light aft swinging on a pole; that all of the lights were dim; that, because of the angle at which the Lehigh approached the Loretta, the lookout and mate could not see the red light on the Loretta until she had ap-proached to within about three boat lengths of the Loretta; that the red and white lights on the two stern barges, visible approximately one-half mile, were to the starboard of the Lehigh sufficiently far to warrant the mate in taking no further precaution than slowing down, as he could with ordinary care safely pass between the tug on his port side and the two barges on his starboard; that when the red light on the Loretta was first observed, everything was done by the Lehigh that was required by her in the exercise of the highest degree of care, and that the collision was then inevitable. The Loretta was clearly at fault under the provisions of rule 9 of the White Law, Great Lakes Rules (33 USCA § 258).

In addition to the above, considering all the facts in the case, but particularly that the Loretta lay in the direct path of incoming vessels, that traffic was heavy, that visibility was bad, and that she was more than 800 feet away from the tug, it was her duty to have a lookout on deck at and prior to the time of the collision. 33 USCA § 221; The America (C. C. A.) 102 F. 767, 768; The Ariadne, 13 Wall. 475, 20 L. Ed. 542; Delaware, L. & W. R. Co. v. Central R. Co. (C. C. A.) 238 F. 560; The Sapphire, 11 Wall. 164, 20 L. Ed. 127; The Clara, 102 U. S. 200, 26 L. Ed. 145; The Ciudad de Reus (C. C. A.) 185 F. 391; The Guyandotte (D. C.) 39 F. 575. His presence would have enabled him to warn the onrushing Lehigh in time to avoid the collision.

The Ballenas was similarly at fault for failure to have a lookout. She blew no danger signals to the Lehigh. The only danger signals blown by the Ballenas were those blown, after the collision, to the Lynch.

The collision happened in the course regularly followed by upbound vessels navigating between Buffalo and Lake Erie ports and Detroit, Mich., and, thus, within a navigable channel within the meaning of sections 15 and 19 of chapter 425 of the Act of March 3, 1899 (33 USCA §§ 409, 414). Red Star Towing & Transportation Co. v. Woodburn (C. C. A.) 18 F.(2d) 77; Eastern Transportation Co. v. United States (D. C.) 29 F.(2d) 588, affirmed The Snug Harbor (C. C. A.) 40 F.(2d) 27; Petition of Highlands Navigation Corporation (C. C. A.) 29 F.(2d) 37; The Alfred W. Booth (D. C.) 127 F. 453. The evidence is clear that the tug and tow im-

82

peded and hindered navigation, and was tied up or anchored in such a manner as to prevent or obstruct the passage of other vessels. Both the tug and barge were at fault for lying at anchor in an improper place. 33 USCA § 409.

█ It is urged that the fact that other vessels successfully passed the tow and tug safely is sufficient to establish that they were not at fault in anchoring as they did. Exactly the same argument was presented in the case of The Caldy (D. C.) 123 F. 802, affirmed (C. C. A.) 153 F. 837, without success. It was held that even though the anchored vessels did not prevent the passage of other vessels, they at least obstructed their passage.

█ There was culpable negligence in the Loretta's being anchored or held in an improper place, particularly when her presence was so near to the entrance of the river channel as to increase the difficulties of navigating vessels properly there. The Caldy, supra; United States v. St. Louis, etc., Transp. Co., 184 U. S. 247, 22 S. Ct. 350, 46 L. Ed. 520. The captain of the tug and the men on all the barges knew that the tug and tow lay across the channel and that the anchorage was dangerous. There was no necessity for the Ballenas and tow to anchor at the place she did. The captain testified that he had not intended to remain there any considerable length of time and that, had he suspected that the weather would continue bad, he would have anchored in the lee of Middle Sister Island, some twelve miles to the south, and that there was plenty of room to safely anchor at the south and southwesterly without presenting difficulties to navigation. He expected the weather to clear up so he could proceed up the river shortly. But had it been necessary to anchor where she did, it was especially reprehensible for her to remain there for a period of over four hours directly in line of the heavy traffic occurring at that time of year without adequate lights or other safeguards to protect herself and other vessels from harm. The John H. Starin (C. C. A.) 122 F. 236. She not only failed to observe statutory requirements, but ordinary precautions of good seamanship as well, and she must suffer the consequences of the violation of the law. United States v. St. Louis, etc., Transp. Co., supra.

█ It is urged on behalf of the tug and tow that the Lehigh should be held to the highest degree of care to avoid the colli-

sion. The rule is settled that where a moving vessel collides with a vessel at anchor in a proper place and the latter is without fault, unless it appears that the collision was the result of inevitable accident, the moving vessel must exonerate herself from blame by showing that it was not within her power to prevent the collision by adopting any practical precautions. The Virginia Ehrman, 97 U. S. 309, 315, 24 L. Ed. 890; The Oregon, 158 U. S. 186, 192, 15 S. Ct. 804, 39 L. Ed. 943; The Granite State, 3 Wall. 310, 18 L. Ed. 179; The Gulf of Mexico (C. C. A.) 281 F. 77. That degree of care on the part of the moving vessel is not required when the anchored vessel is in the wrong place and is otherwise at fault; in such a case the moving vessel is required to show that she exercised only ordinary care and caution to avoid the collision to exonerate herself from blame. Dahlmer v. Bay State Dredging & Contracting Co. (C. C. A.) 26 F.(2d) 603; The Yucatan (C. C. A.) 226 F. 437.

█ It is urged that the Lehigh has failed to meet the burden of proof required of her to exonerate herself because her lookout was temporarily absent from his post as she approached the Loretta. It is a primary rule of navigation that moving vessels must maintain a competent and efficient lookout, and nothing can exonerate such a vessel for failure to have a lookout at all times attentive to duty. 33 USCA § 221; The Oregon, 158 U. S. 186, 193, 15 S. Ct. 804, 39 L. Ed. 943. Neither the pilot nor the helmsman can take his place. Dahlmer v. Bay State Dredging & Contracting Co. (The Orion) (C. C. A.) 26 F.(2d) 603. But it is subject to the equally well-settled rule that "the absence of a lookout * * * is not material, if the presence of one would not have availed to prevent a collision." The Blue Jacket v. Tacoma Mill Co., 144 U. S. 371, 12 S. Ct. 711, 36 L. Ed. 469; The Nacoochee, 137 U. S. 330, 11 S. Ct. 122, 34 L. Ed. 687. In view of the fact that the mate was in full possession of all the information a lookout could possibly give, the lookout's absence from his post for a period of thirty seconds prior to the time when any one even with the aid of glasses could see the barge or her lights will not be considered a fault making the Lehigh responsible for the collision. The Owego (The Chicago) (D. C.) 71 F. 537, affirmed (C. C. A.) 100 F. 999; The Maria Martin, 12 Wall. 31, 20 L. Ed. 251; The Blue Jacket v. Tacoma Mill Co., supra. No

absence of the lookout from his post in any way contributed to the collision.

It follows that the Lehigh must be exonerated from any fault causing or contributing to the collision, and the libels against her must be dismissed, with costs.

■ As above indicated, the Ballenas and Loretta were brought in by petition under Admiralty Rule 56, and it is the duty of the court to settle the entire controversy. Both the Ballenas and the Loretta were seaworthy, properly manned, equipped, and supplied at the beginning of the voyage, and the collision and sinking of the Loretta was due to errors in navigation and in the management of the tug and barge. The tug and tow constitute a single carrier within the meaning of section 3, c. 105, of the Act of February 13, 1893 (46 USCA § 192) and neither vessel can be held for loss of the cargo [In re O'Donnell (C. C. A.) 26 F. (2d) 334], and the suit of the Grasselli Chemical Company must be dismissed.

■ As the collision was caused through the concurring faults of the Ballenas and the Loretta, each vessel must suffer one-half of the loss of the Loretta (The Eugene F. Moran, 212 U. S. 466, 29 S. Ct. 339, 53 L. Ed. 600), and Laurence E. Coffey, of Buffalo, N. Y., will be named commissioner to hear the testimony and report as to such loss.

This decision will stand as the findings of fact and conclusions of law, in conformity to the requirements of Admiralty Rule 46½ (28 USCA following section 723), unless the parties desire to file separate findings. In that event, proposed findings must be submitted within ten days for settlement. Otherwise, a decree may be entered to carry this decision into effect. So ordered.