## THE MESSENGER.
### No. 1394.

District Court, S. D. Texas, Galveston Division.
Aug. 19, 1930.

Harris & Watkins, of Galveston, Tex., for libelant.

Royston & Rayzor, of Galveston, Tex., for respondent.

HUTCHESON, District Judge.

Linde Dredging Company, owner of the dredge Badger, sues Suderman & Young, Inc., and the tug Messenger, to recover damages sustained by the Badger when the tug Messenger backed into her on December 15, 1929.

The collision occurred at 3:30 p. m. in open daylight in clear weather, in the vicinity of No. 9 Bell Buoy near the North jetty entrance to Galveston Harbor, where the steamship Brazos had gone aground hard and fast on a sand bar.

Some short time before the collision, the tug Messenger, with a barge in tow, had come out to the Brazos, put a line over to her, and had taken off some cargo. Just before this operation was completed, and the tug Messenger was ready to cast off and return to Galveston, the dredge Badger, which had been employed to assist the Brazos off the sand bar, had come up and taken her position on the port side of the Brazos even with the stern, and about 300 feet due west, had let down her spud, and was making preparations to assist her.

At that time there was a heavy flood tide of five or six miles an hour running from the Brazos toward the dredge, and with the starboard spud down, the bow of the dredge was held in position on account of the current holding it straight.

At the time the Badger anchored, the Messenger and the barge which it had in tow were at about No. 2 hatch on the port side of the Brazos and about 400 or 500 feet from the stern of the Badger. The Badger's spud

was a heavy timber 16 inches square fitted so that it dropped through guides and anchored the dredge to the bottom and held it rigid.

At the time of the collision the tug Leo was on the port quarter of the dredge, and was just going ahead to swing the bow of the dredge across the current and head the cutter toward the port side of the Brazos. The port anchor of the Brazos was out, the chain hanging fairly slack, practically 45 degrees aft from the bow. The anchor was 100 or 150 feet away from the bow.

There was a good deal of controversy as to the exact position of the libelant's dredge with reference to the Brazos, as to whether it was in or out of the channel, as to the length and location of its pontoon lines, as to the amount of space left in view of the position of the dredge, of the Brazos, of its anchor chain, and the pontoon lines of the dredge, for the tug Messenger to maneuver in, and as to whether it was possible for the tug Messenger to have gotten out in the beginning by going forward over the anchor chain, as it did finally do after the collision.

In the view I take of the case, it is not necessary to precisely resolve these conflicts. It is sufficient to say that as the Brazos, the Badger, and the Messenger were then located, with a heavy tide running down on the Badger, and the circumscribed space within which the Messenger had to move, the circumstances were such that in order to get away from the Brazos and out into the channel without a collision, it was incumbent upon the Messenger either to give notice to the Badger that she needed more room for her maneuvers, or if she decided to make them, cramped as she was for room, to make them so carefully as to avoid injury, or if she did not use such care, to abide the consequences.

Whether the collision occurred because, as claimed by those on the Badger, the tug backed out at high speed, and backed directly down on her, or whether, as claimed by those on the Messenger, the tug took a long time getting out, and finally drifted down on the Badger because overcome by the heavy tide, is wholly immaterial in the placing of the fault in this case, though the statements of the occurrence as given by those on the Badger seem more reasonable than those given by the Messenger are; for situated as she was, more was required of the Messenger than to back down on the Badger and then complain of the position which the Badger had taken, or of the fact that she had let down her spud.

In the pleadings the respondent claimed that the cause of the injury was the Badger's negligence in failing to co-operate with the Messenger, and by suddenly letting down her spud, fixing the dredge in place, and giving force and consequence to the collision which it would not otherwise have had.

At the trial the respondent took the further position that the real cause of the trouble was that though the Badger had let her spud down, she had failed to put up the ball signals required by the rules, and asked leave to amend to plead this ground of negligence. Because it plainly appears that the presence or absence of the ball signals has no legal significance in this case, this leave was denied, and the motion for leave to amend after the close of the evidence was again denied.

In its brief the libelant claims that the collision was due to the fault of the Messenger in not taking proper precautions either to obtain more clearance in starting the maneuver, or having started it, in not taking proper precautions to come out, and in that it negligently and recklessly, with a full flood tide running down on the Badger, backed against her at high speed.

I think the evidence fairly sustains the general theory of the libelant that the injury was due to faulty maneuvering. The captain of the Messenger claims that the collision occurred because the tide got him. Linde, the owner of the dredge, claims it occurred because he backed out at full speed. Whether he came out at full speed, or whether he allowed himself to drift down on the Badger, is immaterial. He had a situation which required skill in maneuvering. He had two moored vessels, one stranded, the other moored in a position to succor the stranded vessel. He knew that the space he had to maneuver in was greatly circumscribed. He knew the tide was running strong and full. Under these circumstances, he cast off his lines, popped out of his mooring like a rabbit out of a warren, and either because the tide got him, or because the tide and his own speed got him, he delivered a severe and smashing blow against the Badger.

Not only the witnesses on the Badger, but those on the Messenger, testified to hearing the crack of timber breaking at the time of the collision.

Linde testified that from the force of the blow the dredge took a terrific sheer and its deck was nearly pulled under the water. The complete breaking of the heavy spud testifies to the power with which the blow was delivered. Linde testified to the quick-

ness of the impact following the backing out, and that though orders were given in an attempt to raise the spud, it was impossible to do so within the time allowed after the tug commenced to bear down on her, and I find that those on the dredge did everything possible to avoid the collision in the limited time allowed them.

At the close of the evidence it seemed entirely plain to me that the whole causal fault was on the Messenger, and that if there was any fault on the part of the dredge in the matter of letting down the spud, or in not displaying the customary signals indicating that the spud was down, this fault was in no sense the proximate cause of the collision. That the fault was altogether that of the Messenger in taking the chance that it did.

Since the briefs have come in, and I have further considered the evidence and the law of the case, I am the more convinced of the correctness of the trial conclusion.

There is a line of cases decided in the Second Circuit where tugs have damaged vessels lying alongside piers in positions condemned by the New York statute, and have sought to shift the responsibility for the resultant injury upon the moored vessel on the ground that the vessel was improperly moored, either in violation of the statute or of the ordinary rules of care.

In all of these cases the courts have held the tug to accountability, some of them dividing the damages, because of the gross fault of the moored vessel in violation of the pier end statute others denying the division on the ground that though there was fault on the part of the moored vessel, it was not an outlaw, and the ramming tug had no business to bear down on or use it recklessly and without care.

One of these cases, The Baker Bros. (C. C. A.) 260 F. 650, 652, is illuminating here, and I quote from it:

"The Augustine was at rest, in full view, in clear weather, and in broad daylight. The tug Baker Bros., being in the slip between Piers 5 and 6, which it had entered that day, backed out of the slip at full speed; the slip being so full of canal boats that the tug could not turn around. The tide at that time was ebb and strong."

The master testified:

"We have to come out full speed, because, if not, coming out slowly, the tide would set us down against anything on the end or against the corner of the pier. ⁕ ⁕ ⁕

"Q. And you backed out faster? A. Yes, sir.

"Q. And the tide pulled you down against the Augustine? A. Yes, sir.

"Q. Before backing out, you did not request anyone to move those boats? A. No, sir.

"Q. And you backed down—you knew that strong tide was there? A. Yes, sir, ⁕ ⁕ ⁕

"Q. You were in a tight place, and you knew it? A. Yes, sir.

"Q. You knew you had a close shave to get out, didn't you? A. Yes, sir; but it is customary that you work around those piers in very close quarters."

In the case at bar the tug was so circumstanced, according to all the testimony, that just as the Baker Bros. had, so it had a hard maneuver to make. Instead of trying to get out forward, instead of requesting those on the Badger to open up for him, or those on the Brazos to get the anchor chain out of the way so as to give him a better opportunity for his maneuver, he preferred to take a chance, and backing out in a full tide, he ramped down on the Badger, smashing her a terrific blow and breaking her spud.

Under these circumstances, it will not do for the Messenger to insist that the Badger must be held also at fault for not displaying signals, upon the theory, first, that the tug would not have hurt her by bumping her, if the spud had not been down; and, second, if the master of the vessel had been properly warned that the spud was down he would have made the maneuver differently, for the whole causal fault here was the action of the Messenger in trying to back out as it did.

Another New York case, very much in point, is The Jersey Central (C. C. A.) 30 F.(2d) 269, 271. There a moored barge, the Australia, lay contrary to the statute across the pier end. The tug Jersey Central warped into the slip using the Australia as a fulcrum, damaging her in the operation. The master of the Jersey Central did not ask the Australia to move, but proceeded to treat her as a pier end. The District Court granted a decree for damages against both tugs, against the Sullivan because of the negligence in mooring the Australia at the end of Pier 39, in violation of the pier end statute, and against the Jersey Central for its negligence in using the barge as a pivot. The Circuit Court reversed the District Court, and after reviewing the pier end cases, held the tug Jersey Central solely liable, saying:

"We hold that the fault of the Jersey Central in pivoting her float on the barge, without warning the latter, or giving her an opportunity to remove, was the sole cause of the injury. Had the warning and opportunity been given, the justification of the tug for attempting the maneuver would have depended on the degree of manifest danger. Any risk so serious as to imply intentional injury would have deprived the tug of the benefit of the statute. * * * To be sure the barge was not an outlaw, and other vessels were obliged to navigate in respect to her with due care. But, if she had persisted in continuing at the end of the pier in violation of the statute, after due warning and an opportunity to move, the Jersey Central would not have been obliged to cease her occupation as a tug engaged in landing her float, unless the danger of entry was so great as to involve deliberate disregard of the safety of the barge. But here the Jersey Central was under no necessity of taking a great risk, or any risk. She could have warned the barge and have secured her removal. Instead of adopting a known and common method of obviating all danger, she took the chance of pivoting her long float on the barge in an ebb tide, with resultant injury to the latter. Such conduct was without excuse and negligent, and was the sole cause of the injury."

So here, without any warning, without any request for clearance, the tug took the chance, as in the Baker Bros. to back out and as in the Jersey Central, to use the moored vessel for a fulcrum, and, since she undertook this dangerous maneuver, and in executing it backed down and caused the damage, she must be held solely accountable for it.